ARKANSAS POWER & LIGHT COMPANY *v.* STEINHEIL.

4-3662

Opinion delivered February 18, 1935.

*Rose, Hemingway, Cantrell & Loughborough,* for appellant.

*Tom Kidd* and *Sam T. & Tom Poe,* for appellee.

SMITH, J. This suit was brought by Mrs. O. B. Steinheil, the mother and legal guardian of Louise Steinheil, an adult incompetent, to recover damages to compensate an assault committed upon her daughter while she was a passenger on one of appellant's street cars by a fellow-passenger, and from a verdict and judgment in plaintiff's favor in the sum of $5,000 is this appeal.

On Sunday night, August 17, 1930, Louise Steinheil, a white girl, then 18 years of age, after attending church with her mother, left her mother and boarded an outbound Pulaski Heights street car at Markham and Main streets in the city of Little Rock. The car was operated by only one man, who was both conductor and motorman. The car was one of the largest in use by the appellant street car company. It was forty feet long, and its inside measurements are about thirty-eight and one-half feet. It has seven cross seats on each side separated by a passageway between them, or fourteen cross seats altogether. It has four long seats running lengthwise, two at the front end, two at the rear. The long seats commence about four feet behind the motorman and are five and one-half feet long. The cross seats are about thirty inches apart.

When Miss Steinheil entered the car, she found it crowded with passengers, but she made her way towards the rear end, where she found a seat, the only vacant seat in the car. Ellis Wage was occupying this seat, sitting next to the window, when Miss Steinheil sat down. This window and other windows in the car were open. The car proceeded west on Markham Street, until it reached Chester Street, where it made a right-hand turn off Markham Street, before Wage noticed Miss Steinheil.

Wage was a World War veteran, who had been gassed during the war, and whose vision was somewhat impaired when he was not wearing glasses. He was not then wearing them. Miss Steinheil is of dark complexion, and, as was shown, when six years old she was severely burned over the anterior surface of the chest and abdomen, and also her chin and neck, leaving much scarred tissue. When Wage first observed Miss Steinheil, he thought she was a negro, and told her so and ordered her to go to the rear end of the car where other negroes were riding. She replied that she was not a negro, that she was as white as he was, that she had paid her fare and intended to occupy that seat.

This suit is predicated upon the theory that the motorman did not afford the passenger the protection to which she was entitled from the insult and subsequent assault of her fellow-passenger, and, as we are of the opinion that this is the controlling question in the case, we recite the testimony upon that issue of fact somewhat extensively.

Mrs. J. C. McFarland testified that she boarded the car after attending a band concert, and that she was seated "on the right-hand side facing towards White City" (in which direction the car was traveling). "I judge five or six seats from the front, about in the center," and that Wage and Miss Steinheil were seated "just one seat in back of me across the aisle." The witness heard the controversy between Wage and Miss Steinheil. "It attracted attention. They wrangled quite awhile." The controversy began about when the car turned at Chester Street. Wage finally forced Miss Steinheil out of the seat; "he just pushed her, both hands, forced her to shove out of the seat. The girl took hold of the seat in front of her and kind of stumbled, you know, and then she went up to the motorman and tried to tell him." Her clothes had been disarranged and she was crying. Some ladies in the front of the car arranged Miss Steinheil's clothes and gave her a seat. They gave her a seat and tried to console her. "This man" (Wage), "as soon as he found out she was not a negro, he was awfully sorry. He apologized and said

how sorry he was. Two or three times he talked to the girl and tried to apologize.''

When asked about the tone of Wage's voice, when he told Miss Steinheil that she was a negro, the witness answered: ''He talked real loud. He was very repulsive and excited. Everybody could hear it. People in the front of the car could hear. It attracted everybody's attention. It really disturbed everybody in the car.'' When asked about what the motorman did, she answered: ''He kept running the car. He did not pay her any mind.'' The motorman was standing, and just above him was a mirror, into which, had he looked, he could have seen every one to his rear. The motorman was standing, ''perhaps I should judge, maybe six seats from the girl,'' and when asked if she could hear what Miss Steinheil said to the motorman when she went to him, the witness answered that she could not. The witness also testified that, ''when she'' (Miss Steinheil) ''went up there'' (to the motorman), ''the thing was all over;'' that Miss Steinheil, ''who was crying, evidently asked for protection, but the motorman did not stop the car. The car was well loaded.''

F. M. Werling testified that he sat in the seat with Mrs. McFarland. He was seated next to the aisle about five or six feet from the front, and that Miss Steinheil and Wage were on the opposite side of the aisle one seat nearer the rear. He heard the controversy between Miss Steinheil and Wage, which Mrs. McFarland had related. Speaking of Wage's tone of voice, he said: ''Well, looks to me like everybody heard it in the car,'' but that Miss Steinheil ''did not talk back to him in a loud tone of voice.'' The controversy ''continued five minutes, or maybe more,'' but had ceased before the car reached the Union Station, which was six or seven blocks from the point where the controversy began. This witness was a little hard of hearing, but he heard the controversy distinctly. The motorman did not stop the car or try to protect the girl. The car was crowded and continued to be until the Union Station was reached. The witness knew Miss Steinheil was a white woman, he had seen her earlier in the evening riding in the front of a car with

other white women, and he later told Wage that he had made a mistake. No one testified that the car made any stop after turning at Chester Street, where the controversy began, before reaching the Union Station, prior to which time "the thing was all over," as Mrs. McFarland expressed it.

Two other white women—one of them a teacher in the public schools of Little Rock—were passengers on the car. They occupied a seat together on the left side of the car near its center. Wage and Miss Steinheil were seated behind them. They, too, like a number of other passengers, were returning from church, and stated that the car was crowded. They heard Wage tell Miss Steinheil to go to the rear of the car with the other negroes. He spoke in an ordinary conversational tone of voice, and the transaction was of very short duration. After the commotion Miss Steinheil went to the front of the car and spoke to the motorman, who found her a seat, and nothing thereafter occurred, except that one of these young ladies told Wage, whom she knew, that he was mistaken, and that Wage went to where Miss Steinheil was then seated and attempted to apologize.

The testimony of Wage was to the same effect substantially as that of the two young ladies.

The motorman testified that he had been standing, but that he was seated when Miss Steinheil reported the incident herein detailed to him, and that this was the first intimation he had that anything out of the ordinary had occurred. He testified that the car was crowded, and that a few passengers were standing on both the front and rear platforms of the car. He admitted that he might have heard a conversation between passengers in the middle, or even in the rear, of the car, if he had been paying particular attention, and that he might have seen what was happening in the car if he had looked in the mirror over his head. But he testified that he did not hear any of the conversation between Wage and Miss Steinheil, and did not see Wage shoving her from the seat. He was engaged in operating the car turning the corners between Chester Street and the Union Station. The car was making much noise, and there was the noise

of other traffic in the streets. That the primary purpose of the mirror is to enable the motorman to see the rear door, from which end the colored passengers leave the car. He ordinarily did not look into the mirror, unless there was some occasion for him to do so, and he admitted that he may not have looked into the mirror between Chester Street and the Union Station.

It is insisted, for the reversal of the judgment, that a verdict should have been directed in appellant's favor upon three grounds: "(1) That there was no evidence of negligence; (2) that there was no physical injury, and (3) that there was no proof that the incident detailed caused or aggravated the plaintiff's condition."

It was shown that she had a pronounced and permanent case of hysteria. We think the testimony establishes the fact that there was a physical injury. We are also of the opinion that there was sufficient testimony to support the finding that the plaintiff's condition, if not caused, had, at least, been aggravated, by the incident detailed. But we think the assignment of error that there was no breach of the carrier's duty constituting negligence must be sustained.

We must, of course, view the testimony in the light most favorable to appellee; but, when we have done so, we think a case was not made for the jury.

Appellee quotes from the chapter on Carriers in 4 R. C. L., §§ 606, 607 and 608, as correctly declaring the law applicable to the facts of this case; and we concur in that view. It was there said that a carrier owes to its passengers the duty of protection from the violence and insults of other passengers or strangers, so far as this can be done by the exercise of a high degree of care, and will be held responsible for its own or its servants' negligence in this particular, when, by the exercise of proper care, the act of violence might have been foreseen and prevented. That the negligence for which, in case of an injury to a passenger by a fellow-passenger or a stranger, the carrier is held liable, is not the tort of the fellow-passenger or stranger, since there is no such privity between the carrier, and such tort-feasors as to make the carrier liable, on the principle of *respondeat superior;*

but it is the negligent omission of the carrier, through its servants, to prevent the tort from being committed which renders the carrier responsible. That the negligent failure of the servants of a carrier to prevent the commission of the tort being the basis of the action, it follows that for this omission or failure to be actionable negligence there must be a failure or omission to do something which should have been done by the servant, and there is, therefore, involved the essential ingredient that the servant had knowledge, or, with proper care, could have had knowledge, that the tort was imminent, and that he had that knowledge, or had the opportunity to acquire it, sufficiently long in advance of its infliction to have prevented it with the force at his command; but that, where a passenger has been assaulted by a fellow-passenger, under circumstances that could not have been reasonably anticipated, in time to prevent it, the carrier will not be held responsible therefor.

Many decisions of this and other courts support these declarations of law; but we shall not review them. The question presented is, whether, under the law as thus declared, when applied to the facts of this case, the judgment appealed from may be affirmed.

In deciding that question we cannot take into account the outrage imposed upon Miss Steinheil by Wage in and of itself, for, as was said in the text cited, the carrier is not liable for the tort of the fellow-passenger, as the principle of *respondeat superior* has no application. The carrier, if liable at all, is liable for the negligent failure to prevent its commission; but, if so, it is then liable for its consequences.

It is, no doubt, true that when Miss Steinheil went crying to the motorman, he and all the passengers were advised what had happened. But the wrong had then been done. The motorman testified that his first information or intimation that trouble had occurred was given him by Miss Steinheil when she came crying to the front of the car; and there is no testimony to the contrary. There is some testimony to the effect that he might have seen the trouble had he looked into the mirror; but there is no evidence of any circumstance that imposed this

duty upon him. Had he done so, he would have seen Wage pushing Miss Steinheil off the seat; but that action would have been complete before he could have reached the scene of its occurrence. The assault was not continued after Miss Steinheil was pushed off the seat. No witness so testified. As far as the testimony goes is to establish the fact the motorman might have heard the controversy had he been paying attention to the passengers. But the incident was not one to be expected. It was most unusual. The car was crowded, and the testimony is conflicting as to the distance it ran while the controversy was in progress. No witness placed the distance at more than seven blocks, and others less. It could not have required any great length of time for the car to travel that distance, as no stops were made. The controversy did not assume such proportions or continue for such period of time as to induce any passenger in the car to interfere. Those persons who heard it knew its cause. Miss Steinheil was exercising the simple, but absolute right of riding in the part of the car occupied by white persons. Two of the witnesses, one for appellant and the other for appellee, knew that Miss Steinheil was a white woman. The mere statement of that fact to Wage would, no doubt, have ended the controversy; and, while the passengers were under no legal duty to interfere and afford the passenger protection, it is inconceivable that one or the other of those persons would not have told Wage of his mistake had the controversy been long continued or of threatening aspect. The undisputed testimony is that Wage repented his conduct as soon as he was advised of his mistake, and attempted to make amends by several apologies. No one stated that he was drunk or drinking. There is no evidence that the motorman knew of the controversy in time to have prevented the assault, and only the possibility was shown that he might have known of it had he looked or listened.

In volume 1 of Nellis on Street Railways (2nd ed.), at page 589, it is said: "A street car conductor is not required to use critical skill or judgment while in the performance of his ordinary duties in a crowded car, in

observing closely the capacity or intelligence of a particular passenger, but is held only to that degree of discrimination which a reasonably prudent and observing man would exercise under the circumstances.''

The case of *Norris* v. *Southern Ry.*, 84 S. C. 15, 65 S. E. 956, was one in which the duty of a carrier to protect its passengers from wrong or injury by a fellow-passenger was discussed, and, quoting from one of its earlier cases, the Supreme Court of South Carolina there said: ''Indeed, interference on the part of a conductor with free communication between passengers will be generally regarded as impertinent by those concerned, except when there is a clear violation of the rules of good behavior by one passenger to the annoyance of others. When that moment comes, it is obviously the duty of the conductor to act, but to know the moment until complaint is made by the passenger of annoyance is often extremely difficult. Ordinarily any unwelcome advances by one passenger to another may be effectively rebuffed by the passenger himself. In applying the highest degree of care to this duty of protection by the conductor, it is further to be borne in mind that good conduct and respect among passengers is the rule, and insult and wrong extremely rare, and that experience has shown that the other duties of a conductor requiring his absence from the car from time to time may ordinarily be performed without risk of injury of one passenger to another in his absence. Hence it cannot be laid down as a general proposition that the exercise of the highest degree of care for the protection of passengers from each other requires that the carrier should keep a watch over the passengers on its train except over those from whom it has a reason to anticipate improper behavior.''

Viewed in its light most favorable to appellee, we have concluded that the testimony does not support the finding that the motorman, exercising that degree of care which the law imposes, should have anticipated the trouble in time to have prevented it, and the judgment must therefore be reversed, and the cause will be remanded for a new trial. It is so ordered.

JOHNSON, C. J., (dissenting). The majority opinion presents the paradoxical situation of the court holding that a carrier of passengers for hire is required to exercise a high degree of care to protect its passengers from assaults and violence at the hands of fellow-passengers or a stranger, yet determines that a robot may be placed in charge of the operation and control of such car to enforce safety or furnish protection to such passengers. I agree with the rule of law stated by the majority in reference to the high degree of care required of a carrier of passengers for hire in protecting such passengers from assaults or violence at the hands of fellow-passengers or strangers, but I cannot agree to its non-application under the facts and circumstances of this case. This mechanical man set up by appellant to afford protection to its passengers had ears but refused to hear the vile language used by the passenger Wage towards Miss Steinheil, a fellow-passenger upon the car, although the language was heard by all other passengers in the car and was known by all to have continued for a period of not less than five minutes without let or hindrance; he had eyes, the majority say, yet this harangue continued between Wage and the young lady while the car traversed from five to seven blocks, yet this man did not see, although he had before his face a mirror placed there for this very purpose which could and would have reflected immediately before him this unlawful and outrageous assault; all this man would have had to do was to open his eyes and look in this mirror. If these uncontroverted facts show the exercise of that high degree of care required by a carrier of passengers towards his passengers, as a matter of law, as held by the majority, then I assert that "a high degree of care" as used in all the law books on the subject is a misnomer, and the protection it has heretofore been thought to afford passengers is a delusion and a snare to catch the unwary. If questions of fact as presented in this case present no controversy for a jury's consideration and judgment, as held by the majority, then we had as well abolish trials to juries and revert to "trials by ordeal," and give to the courts

that much cherished but ever doubtful appellation, "it can do no wrong."

There is no reversible error in this record and it should of right be affirmed. I respectfully dissent.

I am authorized to say that Mr. Justice HUMPHREYS concurs in this dissent.