## INDUSTRIAL PARK BUSINESSMEN'S CLUB, Inc. et al v. William I. BUCK

5-5863                                                      479 S.W. 2d 842

Opinion delivered May 8, 1972

*J. H. Cottrell, Philip Ragsdale* and *Fred North,* for appellants.

*Patton, Brown & Leslie,* for appellee.

JOHN A. FOGLEMAN, Justice. Appellee William I. Buck recovered judgment against appellants for compensatory and punitive damages because of severe, permanent and disabling injuries attributable to a gunshot wound inflicted upon him at the Industrial Park Businessmen's Club in Little Rock during the early morning hours of November 18, 1969. Appellants urge only two points for reversal, i.e., failure to direct a verdict in their favor and to declare a mistrial when a witness was asked if she knew that Kennth Shaw had served time in the penitentiary.

Appellants' argument on the first point is that appellee's testimony is so greatly contradicted by witnesses called by him and that there are so many contradictions in the testimony of all the witnesses called by him that the verdict was against the manifest weight of the evidence and the supporting evidence not substantial. Of course, we are not concerned with the preponderance of the evidence. *Hubbard* v. *Graves,* 240 Ark. 64, 398 S.W. 2d 69. Although the testimony probably contains more inconsistencies and conflicts than are usually found in the versions of an altercation related by participants and eyewitnesses, due to the fact that all here appear to have been under the influence of intoxicating liquors to varying degrees, the resolution of these conflicts and inconsistencies was a matter for the jury. *Blissett* v. *Frisby,* 249 Ark. 235, 458 S.W. 2d 735; *Arkansas Power & Light Co.* v. *Kennedy,* 189 Ark. 95, 70 S.W. 2d 506. We cannot say that any of the testimony offered on Buck's behalf relates a version that was physically impossible or not reasonably probable or that reasonable minds could only reach a conclusion contrary to the verdict or that the versions given by these witnesses present theories so much in opposition that we can say that the jury was left only to speculation and conjecture to decide between two equally probable, but inconsistent, hypotheses as to the proximate cause of Buck's injuries.

In reviewing the evidence, it will, as required, be stated in the light most favorable to appellee and all doubts resolved and inferences drawn in his favor. *Pearrow* v. *Huntsman,* 248 Ark. 1146, 455 S.W. 2d 128. The testimony will also be considered in the light of the instructions to the jury, about which no complaint is presently made.

The court instructed the jury that Buck would be entitled to recover damages for failure of Martin or Shaw or both to use ordinary care, or for acting negligently with a wilful or wanton disregard for the rights and safety of others or for an assault on Buck, if such conduct was a proximate cause of his injury. The court also advised the jury that Buck could recover from Barg and Industrial Park Businessmen's Club if he or it were guilty of negligence which was the proximate cause of

the injury. Another instruction stated that it was the duty of the operator of a business to use ordinary care to protect his business invitees from injury resulting from the conduct of its agents or employees or other customers or third persons upon the premises under the circumstances, when such conduct could reasonably have been foreseen and could have been prevented by the use of ordinary care. The jury was also told that even though it found that Buck provoked the assault, the persons provoked had no right to exercise any greater degree of force than appeared reasonably necessary to them to repel an assault by him.

The place where Buck was wounded was being operated at the time under the name "Industrial Businessmen's Club", a nonprofit corporation, but it had been earlier known as the Black Hawk and the Four Seasons. The principal forms of recreation offered by it seems to have been pool and drinking intoxicating liquors. There is evidence that gambling on pool was regularly engaged in, with intermittent approval of the management.

Some facts are undisputed or virtually so. It is clear that Buck made himself obnoxious to everyone present, virtually from the time of his arrival shortly after midnight until he was shot at about 6:30 a.m. on November 18, 1969. He was snatching drinks from those who had been served at the club's bar and periodically falling over the table where Barg, Shaw, Jerry Carpenter, Mike Bale and perhaps others were playing poker. He was also snatching money, either from the pot or some of the players. In spite of his conduct and condition, it seems that he was served beer or whiskey almost whenever he wanted either, doubtless to the knowledge of everyone present.

Martin and Shaw deliberately armed themselves when they prepared to go to the club. Martin carried a newly acquired .32-caliber revolver, described by witnesses as silver or chrome. Shaw carried a .32-caliber Browning automatic, which was dark in color. It was supplied by a magazine or clip. On two different occasions these wea-

pons were turned in to the bartender, but were in Martin's possession at the inception of the disturbance that led to the shooting of Buck.

At least until Barg arrived, the bartender Paul Christ was in charge of the club. After Barg's arrival, Christ turned the bar over to a waitress and did enough drinking himself to have been described by witnesses as drunk. Later he became so upset with the course of events, that he unceremoniously left the premises with the intention of leaving the city for a vacation. Christ said 7 or 8 people were still at the club when he left.

Barg had been convicted of a felony in Chicago and later of another in Arkansas. He could not recall what he had done in Chicago before he came to Arkansas. The premises were leased to Barg, who was at the time paying the owner $300 per month rent. He in turn leased the premises to the club along with the club's equipment for a rental of $1,500 to $1,800. Barg was unable to recall the amount of the rent, saying that he paid no attention and left the matter to his bookkeeper, who at the time was his wife. Barg's daughter and secretary were two of the three directors of the club. Mary Melody, the club's onetime bookkeeper who testified that she made income tax returns for the Bargs and did some bookkeeping for Mrs. Barg's supper club and for the Black Hawk Club, was the other director and the person in whose name the liquor permit was issued. Barg had a key to the club and came there frequently. He had also subleased the premises to the predecessors of this club.

On the morning Buck was shot, the waitresses were told by Christ to ask Barg if they could leave at the usual closing time, 2:00 a.m. When refused permission, they stayed for about two hours longer and then left without permission. Admission standards, ostensibly requiring membership in the club, were rather lax. Several of those present on this occasion were nonmembers. There is no evidence that anyone was turned away.

When Martin asked for the pistols the second time there was quite an argument between him and the bar-

tender, and the bartender released them to Martin upon the specific direction of Barg. Martin left the premises immediately after an ambulance was called for Buck and took his pistol to the apartment of Barbara Winters, one of the waitresses at the club. He said that he took the pistol there because he was on Federal probation and did not want to be caught with a weapon. Barbara Winters' roommate unloaded the pistol which contained five cartridges and one empty casing. After the shooting Buck had powder burns on his chest and still had them on his neck at the time of trial.

Buck's version of the incident follows:

Buck left an establishment called the Red Carpet, where he had consumed some quantity of beer, at about 12:15 a.m. and went to the place the incident occurred, which seems to have been better known to him as the Black Hawk. He had no membership at the club but was admitted upon his statement that he must have hung some steel for Jack Barg. Buck was not actually acquainted with Barg. He was not drunk on arrival at the club. He went to a back room where he watched and participated in pool games and drank more beer. Sometime after he arrived a poker game, in which Kenneth Shaw, Mike Bale, Jack Barg and Jerry Carpenter were participants commenced. Buck was not in the game, but at one time sat at the table to Carpenter's left. He and Carpenter were friends, and Carpenter owed Buck for loans. When Carpenter began to win, Buck reached out to get some of the winnings that Carpenter had put into the pot, in an attempt to recoup a part of Carpenter's debt to him. When this happened everyone in the game "got on" Buck, who then left and went to get another beer.

He did get away with a $42 check of Kenneth Shaw's which Carpenter had won. He went back into the area where the poker game was going on about 4:00 or 5:00 a.m. As a result of something that took place at that time, Martin showed Buck the pistol Martin had and told Buck to straighten up. Buck then sat down

first at the pool table, and then went to sit by Jerry Carpenter. Thereafter, a squabble started, and Buck undertook to get away from the table where the poker game was underway. Shaw moved around behind him; Barg got up from the poker table and moved toward him; and they all jumped Buck, got him down on the floor, struck him several times with one blow causing a cut over his eye. Buck did not recall having a gun and didn't believe that he was too drunk to know whether he had one. While Buck was being held on the floor, Martin was holding a gun on his neck and shoved it down and pulled the trigger. The resulting shot nearly burst Buck's eardrums, but he was not rendered unconscious. He asked Jerry Carpenter to come over and see what was wrong with him. Carpenter told him that his legs were paralyzed. Barg was standing over Buck saying, "Drag him outside, don't let him die in here." Buck did not see Shaw strike him, but he was struck from behind, and he knew that these blows had to come from Shaw because no one else was behind him at the time. Buck did not recall Bale being involved, but thought that Bale was one of those who was on top of him on the floor. He did not think that Barg ever struck him.[1]

When he first arrived at the club, Buck was drinking beer. Later he was drinking whiskey. He admitted that he was drinking pretty heavily but said that he was not drunk. He estimated that he had from three to six beers and three or four drinks of whiskey. The bartender left after Buck arrived, and Barg was running the club thereafter. Barg got Buck a beer and served him a drink, but Buck did not pay for either. Barg was ordering the waitresses and other people around. Buck said he could recall what had happened, but had difficulty relating the events to specific times.

Martin's statement to police officer Bill Bates was introduced through the officer. Martin told Bates that

---

[1]Buck pointed out one of the defendants as a man who was on top of him when the shot was fired, but the record does not further identify this person.

both he and Shaw had pistols which Martin surrendered to Paul Christ, the bartender, about 45 minutes after their arrival at the club. According to him, the poker game started about 1:30. He said that Buck was drunk and frequently grabbed money from the poker table. Martin related that he went to the bartender and demanded the weapons and that Barg instructed the bartender to release them to Martin. Martin stated to Bates that he took his own and Shaw's pistols and returned to the poker game where he sat on the back of a chair with Shaw's automatic pistol in his back pocket and his own in his belt. After he had been sitting there for some time, Buck grabbed some of Bale's money from the table, got behind Martin, grabbed Shaw's pistol and threatened to kill Martin, Shaw and Bale. Martin said that Shaw slipped behind Buck and grabbed him and that Bale grabbed him from the front and that he, Martin, went in on top of all of them, and then a gun fired and Buck went limp. All of the poker players returned to the game, according to Martin, but he then saw blood and called upon someone to call an ambulance. He stated that he remembered pulling his gun and pointing it at Buck, but did not remember firing it.

When called to testify by appellee, Martin verified the truth of his statement to the officer, except for immaterial qualifications. Martin stated that after the bartender and waitresses left, Barg directed Martin to mix drinks and that he went behind the bar and did so. Martin also stated that Barg was the only person giving orders concerning the service of drinks and the poker game, after the bartender and waitresses left. According to Martin no food was served at the club, and the reason he went there was because drinks were served to club members. He testified that every one who went to the club drank.

Detective Kitchens of the Little Rock Police Department related the content of a statement made to him by Kenneth Shaw. It was substantially as follows:

Shaw stated that he was carrying the .32 automatic pistol when he arrived at the club. After having

some drinks, he began to play poker with Barg, Bale and another man whose name he did not know. He became angry when he thought that a pot to which he was entitled was taken from him and asked Martin to get his gun. Martin left, then returned and indicated that he had the pistol. Thereafter the poker game continued for more than two hours without any difficulty among the players. During this time Buck began to fall over the table and spill drinks. On one occasion Shaw slapped him. Later Buck showed up across the room with Shaw's pistol pointed at Martin, threatening Martin and one or two others. Shaw ran toward Buck, who first pointed the gun at Shaw's chest and then turned his attention to others, enabling Shaw to slip behind Buck, struggle with him and take the weapon away, after which someone took it from Shaw. Shaw then turned Buck loose and went back to the poker table, when he saw Buck lying on the floor with a wound in his neck. Shaw did not hear the shot but was drinking pretty heavily and did not recall the exact events as they occurred. He did not know who shot Buck.

When called as a witness, Shaw stated that his testimony on the statement would be the same as to "that portion of it."

Mike Bale's testimony related principally to the altercation in which Buck was shot and the incidents immediately preceding it. He said, in substance:

Buck grabbed some of my money. When I reached to get it, Buck had a gun pointed at me. Shaw and I rose from the table. Shaw and Martin got behind Buck, and he turned upon them and pointed the gun at Shaw. I advanced toward Buck and when he turned back toward me, they got him. All of us got on him at about the same time and had him down and fought awhile. The gun that Buck had was up in the air, and I grabbed it. I then heard the shot, and Buck went down and came back up. The first time he went down I saw a small trace of blood. The second time there was a bigger puddle. I started

to call an ambulance but was told not to do so by Barg. I then left. I do not remember Buck being on the floor when the shot was fired or whether the shot was before or after I got the gun, but it was about the same time. It was the chrome-plated gun that went off. The gun in Buck's hand was a little black automatic without a clip in it. I took it with me when I left and later took it to the police. I did not see Shaw do anything except try to get the gun. I never saw Buck point the gun at Martin.

Christ testified that he removed the clip from the automatic pistol and threw it behind the bar, before he released the pistols to Martin the second time. There was evidence from which the jury might have believed that at least Martin, Barg and Bale were aware of this. There was also testimony that this pistol was "snapping" whenever Buck pulled the trigger during the episode. This clip was delivered to officer Bates by Christ, before the pistol was turned over to the officers with the clip missing. One of the officers testified that the revolver would hold 7 shells. Barbara Winters testified that, as Martin was leaving her apartment to return to the club after the shooting, Bale remarked, "Hershel or I shot a guy". Shaw denied that he had struck Buck, saying that Buck was really too drunk to defend himself with his hands. He did admit slapping Buck.

The evidence was sufficient to support a jury verdict that Martin and Shaw acted negligently or in wilful or wanton disregard for the safety of others in attempting to disarm Buck or, that in repelling an assault by him, they used excessive force.

The evidence must be tested by a different scale insofar as Barg and the Industrial Bussinessmen's Club are concerned. In this regard we find adequate evidence to support a jury finding that the club was a place of public entertainment and the alter ego of Barg. In addition to that set out above there was evidence tending to show that:

While Barg's frequent visits to the club were osten-

sibly for the checking on the equipment, he would drink to the point of inebriation, without paying for his drinks. He often gambled at the club, usually at the pool tables. He frequently sat in the back room at the club. Barg claimed to have first entered the club at 2 a.m. when Martin and the bartender were arguing over the pistols. The excuse for entering was that he saw the lights on and knew that the club should have been closed at that hour. He vaguely remembered trying to get the people there to leave because he had information leading him to believe that Buck, Shaw, Bale and Martin were not persons of good character. After Barg's arrival, no one else gave any order to employees, and he ordered both employees and guests to prepare and serve drinks to other guests for which neither he nor anyone else paid. He was considered by at least one of the employees as one of "the bosses". He had remonstrated with the bartender about the waitresses drinking too much of an expensive brand of whiskey without paying for it. Thereafter, the bartender told these employees to bring their own bottles. The permit for serving drinks was issued to Mary Melody after the first permittee left town. She was selected with her full knowledge that a permit could not be issued to one who had been convicted of a felony.

We have said that no distinction exists between hotels and places of public amusement in the matter of precautions to be taken for persons invited to enjoy the facilities furnished. *Ford* v. *Adams*, 212 Ark. 458, 206 S.W. 2d 970, 207 S.W. 2d 311. We there recognized that neither are insurers of the safety of their guests, but that both are charged with the duty of taking all precautions for the protection of their guests which reasonable prudence and ordinary care would suggest. We recall that we said in *Anderson & Co.* v. *Diaz*, 77 Ark. 606, 92 S.W. 861, 113 Am St Rep 180, 4 LRA (ns) 649, that there is a wide difference between the duty owed patrons by a saloonkeeper and that owed by a common carrier or an innkeeper. In that case, liability was asserted on the basis of the act of a bartender in participating in applying an exaggerated "hot foot" to an intoxicated patron. We held that the

bartender was clearly outside the scope of his employment, so that the master was not responsible for his acts. There is nothing to indicate that the master had any knowledge or was charged with any notice of any hazard to his patrons from this source or by the means utilized. In this state we recognize that a common carrier is charged with the highest degree of care for the safety of its passengers which a reasonably prudent and cautious man would exercise consistent with the mode of conveyance and practical operation of its trains. *St. Louis Southwestern Ry. Co.* v. *Holwerk,* 204 Ark. 587, 163 S.W. 2d 175. But its duty to a "passenger" in a depot, station or similar premises of the carrier is only to exercise ordinary care, the same as is owed to invitees of other businesses. *Crown Coach Co.* v. *Whitaker,* 208 Ark. 535, 186 S.W. 2d 940. See Comment AMI 1701. In *Diaz,* we pointed out that it may well be the duty of an innkeeper to protect his guests from insult and injury. But whatever differences might exist between the duties of innkeepers and saloonkeepers, we have not said that a saloonkeeper would not owe the duty to exercise ordinary care for the safety of his patrons.

Of course, the club would not necessarily be classified as a saloon only. While it was a place where intoxicating liquors were sold, it might also have been classified as a pool parlor. It might also be classified, under the evidence, as a place of public amusement. But, however this club may be classified, Buck must be considered as a business invitee. As such, the proprietor owed him the duty to exercise ordinary care for his safety. *Linxwiler* v. *El Dorado Sports Center, Inc.,* 233 Ark. 191, 343 S.W. 2d 411. The weight of authority supports the view that while a tavern keeper or bar operator is not an insurer of the safety of his patrons, he is under the duty to use reasonable care and viligance to protect guests or patrons from reasonably forseeable injury, mistreatment or annoyance at the hands of other patrons. *Glen Park Democratic Club, Inc.* v. *Kylsa,* 139 Ind. App. 393, 213 N.E. 2d 812 (1966); *Priewe* v. *Bartz,* 249 Minn. 488, 83 N.W. 2d 116, 70 A.L.R. 2d 621 (1957); *Reilly* v. *180 Club, Inc.,* 14 N.J. Super. 420, 82 A. 2d 210 (1951); *Kane* v. *Fields Corner Grille, Inc.,* 341 Mass. 640, 171 N.E.

2d 287 (1960); *Kimple* v. *Foster*, 205 Kan. 415, 469 P. 2d 281 (1970); *Waldron* v. *Hammond*, 71 Wash. 2d 361, 428 P. 2d 589 (1969). Negligence in such a situation may consist of failure to take appropriate action to eject persons of undesirable character from the premises or knowingly permitting irresponsible, vicious or drunken persons to be in and about the premises (*Glen Park Democratic Club, Inc.* v. *Kylsa*, supra; *Priewe* v. *Bartz*, supra) or failure to maintain order and sobriety in the establishment. (*Priewe* v. *Bartz, supra*). Of course the proprietor is not required to protect the patrons of a bar or tavern from unlikely dangers, or improbable harm, but he is required to take affirmative action to maintain order when harm to patrons is reasonably foreseeable, and certainly whenever the circumstances are such as to indicate that the danger of harm to patrons by other patrons should have been anticipated by one reasonably alert. *Priewe* v. *Bartz*, supra; *Reilly* v. *180 Club, Inc.*, supra; *Kane* v. *Fields Corner Grille, Inc.*, supra; *Kimple* v. *Foster*, supra; *Waldron* v. *Hammond*, supra. In this respect, the court's instruction as to the liability of Barg and the club was correct.

There is considerable testimony that Barg himself was drunk while at the club, and it is supported not only by the vagueness of Barg's testimony, but by his admission that the entire episode was all vague to him. He admitted awareness of the character of some of those present and that there was too much confusion about the place. His alleged efforts to persuade others to leave were not apparent. He was ordering the serving of drinks to people who he should have known were intoxicated. As a witness to quite a bit of disturbance, not only did he know that some of the people he considered undesirable were armed, but he also was instrumental in their being armed at the time of the encounter from which the shooting resulted. The course of events called for some action on the part of the management but there is no evidence that any was taken, except that Christ said he unsuccessfully tried to get everyone to leave.

We find the evidence to support the verdict against Barg and the club on the issue submitted to the jury to be substantial.

We find no merit in the second point raised by appellants. Appellee's witness Betty Walloch, manager of the club, was asked if she had been informed that Shaw had been in the penitentiary. A prompt objection was promptly sustained. Motion for mistrial was made by appellants after the witness was excused. The motion was denied, but the Circuit Judge gave a clear admonition to the jury to disregard the unanswered question, saying that it was improper, should not have been asked and should not be considered by the jury at all. We find no abuse of discretion in the denial of this motion and no manifest prejudice to appellants which made the court's action ineffective or insufficient. Under these circumstances we will not reverse the judgment. *Briley* v. *White,* 209 Ark. 941, 193 S.W. 2d 326; *Terry Dairy Co.* v. *Parker,* 144 Ark. 401, 223 S.W. 6.

The judgment is affirmed.

BYRD, J., not participating.