Stephanie M. BOREN and Kimberley J. Vanbibber *v.*
WORTHEN NATIONAL BANK of Arkansas and Worthen
Banking Corporation

95-930 921 S.W.2d 934

Supreme Court of Arkansas
Opinion delivered May 13, 1996

*The McMath Law Firm, P.A.*, by: *Sandy S. McMath*, for appellants.

*Anderson & Kilpatrick*, by: *Michael E. Aud*, for appellees.

ANDREE LAYTON ROAF, Justice. This case presents the issue of a bank's liability for a criminal attack at an automated teller machine ("ATM"). Appellants Stephanie M. Boren and Kimberly J. Vanbibber were shot by a robber while Boren, accompanied by Vanbibber, was transacting business at an ATM owned and operated by appellees Worthen National Bank of Arkansas and Worthen Banking Corporation ("Worthen"). Boren and Vanbibber sued Worthen for

negligence. They appeal from the trial court's award to the bank of summary judgment as a matter of law. We affirm.

On July 21, 1993, at approximately 9:00 p.m., Boren, a customer of Worthen, drove to an outdoor, drive-through type ATM at a Worthen branch on Baseline Road in Little Rock to make a cash withdrawal. Vanbibber was a passenger in her car. As they were leaving the bank's premises, two young men who had been hiding behind shrubs and foliage across the street from the ATM approached. One of the men began firing a pistol into the car, wounding both Boren and Vanbibber. At the direction of the gunman, one woman dropped her wallet and the other her purse out the car window and drove away.

Boren sued Worthen for negligence in (1) failing to install the ATM in a secure manner with proper protective devices against robbers; (2) installing the ATM adjacent to a heavily shrubbed area and housing project; (3) failing to remove or to get permission to remove foliage from the danger of robbery at night and during non-business hours; (4) failing to warn banking customers of the danger of robbery at night and during non-business hours; (5) failing to install adequate cameras to monitor the area; (6) failing to illuminate the area with proper lighting; (7) failing to provide security guards; and (8) operating an ATM in an area where the Bank knew or should have known its ATM customers were vulnerable. Other defendants were named, but were dismissed from the action.

Apparently, Vanbibber filed a similar suit, but that complaint is not part of the record for this appeal. On Worthen's motion, and by agreement of the parties, the Boren and Vanbibber lawsuits were consolidated by the trial court.

Worthen moved for summary judgment and contended that it owed no duty to protect its customers against criminal activity perpetrated by third parties. Worthen admitted during discovery that the Baseline ATM was the first such equipment purchased by the bank, and that it had experienced three incidents of theft, robbery, murder, or attempted murder involving its ATM units since January 1, 1986. One of the three incidents had occurred at the Baseline ATM on May 2, 1993 — less than three months before the occurrence at issue; another incident occurred on November 6, 1993, after the robbery involving Boren.

It appears from the briefs that the trial court first denied the

motion; no order of denial is abstracted or in the record. Worthen then filed a motion to reconsider the denial. Boren responded and attached two affidavits in opposition to the motion to reconsider. In the first affidavit, James Baker, who was president of a security firm and a former Dallas, Texas, policeman, opined that the ATM unit in question was not properly installed or monitored to address danger to the bank's customers and concluded that the bank was negligent. In the second affidavit, Michael Nyberg, State Crime Prevention Coordinator for the Arkansas Crime Information center and Executive Director of the Arkansas Crime Prevention Association, gave his opinion that Baseline Road in Little Rock is the highest violent-crime commercial area in the city. He averred that the danger posed to bank customers was clearly foreseeable.

On reconsideration of the motion, the trial court granted summary judgment. In its letter opinion to counsel, the trial court stated:

> Primarily I am most persuaded by the rationale in the cases set forth in Worthen's original brief and by the Bartley case set out in Worthen's supplemental brief. It seems that jurisdictions across the country share the same reluctance to reassign the duty of protecting our citizens from violent, non-foreseeable, third-party, criminal acts, from the government to the private sector. While the Bartley case is a landlord-tenant case, the reasoning of Professor Schoskinski, adopted by the court, is equally applicable in the ATM cases.

> The language cited by Worthen in its original brief in *Page*, *Cornpropst*, and *Goldberg*, is persuasive. While Mr. McMath has suggested that Worthen had reason to foresee that crime might take place, the language of the brief in that regard is sensible. Crime is everywhere! One is subject to be a victim of violence at virtually every locale, public or private. While some areas are hit more often, there is still no standard to set in place by which the merchant can abide with confidence that the measures taken will ensure the safety of patrons. Certainly, the most capable of police forces in America have not been able to stop crime, or even slow it down, in "high crime" areas.

On appeal, Boren and Vanbibber contend that the trial court erred in two respects. They first assert that the trial court erred in

granting the summary judgment in reliance on a landlord-tenant case which is not applicable to a business-premises case where the business invitee, unlike a tenant, never assumes control of the premises. They further assert that the trial court erred in failing to hold Worthen subject to the standard rule of ordinary care, and that the bank failed to take reasonable steps to assure the safety of its patrons.

## I. Record and Abstract

■ We first note certain deficiencies in the record and abstract. Because Vanbibber's complaint is not included in either the record or the abstract, we are unable to determine whether she was a customer of Worthen, and thus an invitee, or the basis for her cause of action. When essential pleadings are not before us, we affirm the trial court pursuant to Supreme Court Rule 4-2(a)(6). *See In Re Estate of Brumley*, 323 Ark. 431, 914 S.W.2d 735 (1996). We thus will not consider her appeal.

■ Moreover, although we reach the merits of Boren's appeal, the appellants' failure to abstract any portion of some eleven depositions taken in this lawsuit and referenced only by captions in appellants' abstract renders them unusable by this court in our analysis of her issues. Although the depositions are part of the record, we have said many times that there is only one record and seven justices. We will not require seven justices to scour one record for material that should have been abstracted. *See, e.g., In Re Estate of Brumley, supra; Stroud Corp., Inc. v. Hagler*, 317 Ark. 139, 875 S.W.2d 851 (1994).

## II. Reliance on Landlord-Tenant Law

Boren first contends that the trial court erred by relying on a landlord-tenant case, *Bartley v. Sweetser*, 319 Ark. 117, 890 S.W.2d 250 (1994), which upheld the common-law principle that a landlord owes no duty of care to tenants for the criminal acts of other persons. While we agree with Boren that reliance solely on the *Bartley v. Sweetser* decision would be misplaced, the trial court stated further reasons for his decision to grant summary judgment, including the rationale employed in similar ATM cases from other jurisdictions cited by Worthen in its initial summary-judgment brief. Moreover, the trial court acknowledged that *Bartley v. Sweetser* was a landlord-tenant case, but stated that it found the following reasoning employed in this case to be equally applicable in an ATM case:

[T]he notion that the act of a third person in committing an intentional tort or crime is a superseding cause of harm to another . . .; the often times difficult problem of determining foreseeability of criminal acts; the vagueness of the standard which the landlord must meet; the economic consequences of the imposition of the duty; and the conflict with public policy allocating the duty of protecting citizens from criminal acts to the government rather than the private sector.

 Although we cannot say that the trial court relied primarily on *Bartley v. Sweetser* in reconsidering its early denial of summary judgment, Worthen certainly urged that the trial court do so. And, while some of the policy considerations articulated in *Bartley v. Sweetser* may also be applicable in determining the liability of a business owner for criminal acts committed on its premises by a third party, the analysis will not be. In *Bartley v. Sweetser*, we in essence recognized and adhered to our long-standing general rule that a landlord is under no legal obligation to a tenant for injuries sustained in common areas, absent a statute or agreement. We held that a landlord likewise had no duty to protect a tenant from criminal acts. This underlying general rule does not apply to injuries sustained by business invitees on business premises, and we agree that the *Bartley v. Sweetser* decision does not serve as precedent for this case.

### III. Duty of Care

Boren next argues that the trial court further erred in failing to hold Worthen subject to the standard negligence rule of ordinary care. She asserts that had the proper standard been applied, there was sufficient evidence that Worthen (1) knew or should have known that the Baseline ATM was extremely dangerous in that it was "conducive to robbery" and (2) refused to adopt accepted industry standards which would have corrected the danger.

She contends that the two criminal attacks at Worthen ATMs between January 1, 1986 and July 21, 1993, including one at the same Baseline ATM three months prior to the attack on her, are evidence of extreme danger, along with the evidence that the Baseline ATM was in a high crime area. The affidavit of Nyberg opined that the Baseline Road commercial strip is the "highest violent crime commercial area in the city of Little Rock," and that the hazard of an attack by robbers at the Baseline ATM was clearly

foreseeable.

As to the failure to take corrective measures, the affidavit of Baker, Boren's security expert, stated that the Baseline ATM "was not properly installed, monitored, or protected according to accepted safety standards in the banking industry so as to address the foreseeable danger of customers being attacked by robbers." He further specified that the ATM was in a violent area of the city, virtually isolated on a dark side street, beyond the visibility of motorists, that the lighting was inadequate, and that Worthen had declined to use an instructional video made available to it on ATM safety measures.

For the appropriate standard of care, Boren relies on the Restatement (Second) of Torts concerning premises liability and acts of third persons committed against invitees:

> A possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public while they are upon the land for such a purpose, for physical harm caused by the accidental, negligent, or *intentionally* harmful acts of third persons or animals, and by the failure of the possessor to exercise reasonable care to
>
> (a) discover that such acts are being done or are likely to be done, or
>
> (b) give a warning adequate to enable the visitors to avoid the harm, or otherwise to protect them against it.

*Restatement (Second) of Torts*, § 344, pp. 223-224 (1965) (emphasis added). Under comment f to this section, the following commentary is given:

> f. *Duty to police premises.* Since the possessor is not an insurer of the visitor's safety, he is ordinarily under no duty to exercise any care until he knows or has reason to know that the acts of the third person are occurring, or are about to occur. He may, however, know or have reason to know, from past experience, that there is a likelihood of conduct on the part of third persons in general which is likely to endanger the safety of the visitor, even though he has no reason to expect it on the part of any particular individual. If the place or character of his business, or his past experience, is such

> that he should reasonably anticipate careless or criminal con-
> duct on the part of third persons, either generally or at some
> particular time, he may be under a duty to take precautions
> against it, and to provide a reasonably sufficient number of
> servants to afford a reasonable protection.

Section 344 and comment f base liability of a business for the intentional acts of third persons on whether that business had reason to know, from past experience or from the character of the business, that there was a likelihood of danger to the safety of any visitor. Criminal acts by third persons against invitees would appear to be included within this standard.

■ Boren also submits, as precedent, this court's holding in *Keck* v. *American Employment Agency, Inc.*, 279 Ark. 294, 652 S.W.2d 2 (1983). She asserts that *Keck* is authority for the proposition that where a crime victim can show that a defendant breached a duty of care and could reasonably have foreseen that a crime might result from the breach, a jury question of negligence is created. However, *Keck* is as readily distinguishable from the present case as is *Bartley* v. *Sweetser*. Keck was abducted and raped by a person pretending to be a prospective employer. She sued the defendant employment agency which had referred her to the attacker for employment. *Keck* had been placed with him on the same day he had come to the agency's office appearing unkempt, and claiming to be an employer. No background check was done even though the agency's counselors stated that his appearance was bad and that they were shocked by his attire. This court recognized that one is ordinarily not liable for the acts of another unless a special relationship exists between the two, such as master and servant, and that a cause of action for negligence against the employment agency was properly stated because here, such a special relationship was present. We held that the agency had a duty of care arising from its *contractual relationship with the prospective employer*, its ability to foresee some danger to Keck, and because it had some degree of control over the *employers* it made available. Clearly, no such special relationship can be shown to exist between a business owner, such as Worthen, and the criminal element at large in any community.

Although the issue before us is one of first impression in Arkansas, we have previously considered the question of liability of business owners for criminal acts committed against their patrons by third parties. Also, other jurisdictions have decided the precise issue

presented by Boren — the liability of a bank for an attack on its ATM customer — and this issue has in recent years been the subject of numerous law review articles and other writings.

As a starting point in determining if Worthen has a duty of care in this instance, we first consider whether our earlier holdings dealing with business-premises liability for criminal acts have any application to the instant case. We have previously considered the duty of care owed in this context to patrons of saloons, hotels, places of amusement, and common carriers. In *Ind. Park Bus. Club* v. *Buck*, 252 Ark. 513, 479 S.W.2d 842 (1972), a damage award was upheld for a patron shot in an altercation on the premises of a saloon. This court stated that "the weight of authority supports the view that while a tavern keeper is not an insurer of the safety of its patrons, he is under the duty to use reasonable care and vigilance to protect guests or patrons from reasonably foreseeable injury, mistreatment or annoyance at the hands of others."

In *Catlett* v. *Stewart*, 304 Ark. 637, 804 S.W.2d 699 (1991), a damage award was upheld for a guest shot by a hotel employee's husband. The employee failed to call the police during a dispute on the premises with her husband, whom she knew to be violent. This court recognized that while a hotel is not an insurer of the safety of its guests, it is charged with the duty to take all precautions for their protection that reasonable prudence and ordinary care would suggest, and found that there was evidence to support a finding of negligence. In *Twin City Amusement Co. Inc.* v. *Salater*, 237 Ark. 206, 372 S.W.2d 224 (1963), an award of damages was reversed where a patron was struck by a rock thrown at him as he was leaving the grounds of Barton Coliseum after a rock-and-roll concert. The opinion stated that while a proprietor of a theater or other place of amusement has a duty to police the premises and employ enough servants to afford reasonable protection, he is not an insurer of the safety of its patrons. The court characterized the rock-throwing incident as a "sudden, unexpected and unforeseeable affray."

Finally, we have twice considered the duty of care owed to passengers of common carriers. In *Black and White Cab Co.* v. *Doville*, 221 Ark. 66, 251 S.W.2d 1005 (1952), an award of damages to a taxicab passenger was upheld when he was assaulted and beaten by another passenger. The driver of the cab continued on to several destinations during the assault and did not protest, call the police, or

do anything to stop the attack. However, in *Arkansas Power and Light Co.* v. *Steinheil*, 190 Ark. 470, 80 S.W.2d 921 (1935), this court reversed an award of damages for injuries suffered by a passenger assaulted on a crowded streetcar where the motorman was not informed of the assault until after it took place and the evidence failed to show the motorman could have prevented the assault even if he had observed it. In *Doville, supra*, the following duty of care was articulated:

> [A] carrier owes to its passengers the duty of protection from violence and assaults of other passengers or strangers, so far as this can be done by the exercise of a high degree of care, and will be held responsible for its own or its servant's negligence when, by the exercise of proper care, the act of violence might have been *foreseen and prevented*.

(Emphasis added.)

Although we do not consider these cases precedent in the instant case, it is clear that while this court has on several occasions recognized the duty of a business owner to protect its patrons from criminal attacks, we have done so only where the owner or its agent was aware of the danger presented by a particular individual or failed to exercise proper care after an assault had commenced. We must therefore look further for guidance in determining whether Worthen had a duty to protect Boren from criminal attack under the particular circumstances involved in the operation of an unattended ATM facility.

█ We thus turn to consideration of the cases in which other jurisdictions have decided the issue presented by the attack on Boren. Both Boren and Worthen have cited foreign case law in support of their respective arguments. It is generally recognized that from these and other cases involving criminal attacks on business invitees in general, three tests have evolved for determining whether a duty of care is owed by financial institutions to protect ATM users against the criminal acts of third parties. *See generally* 3 *Premises Liability*, Second Edition, § 49:3 *et seq.* (1995); Gregory W. Hoskins, *Violent Crimes at ATMs: Analysis of the Liability of Banks and the regulation of Protective Measures*, 14 N. Ill. U.L.Rev. 829 (1994). In all three tests, the foreseeability of the criminal act is a crucial element in determining whether a duty is owed.

The first and most basic approach is referred to as the Specific

Harm Test. In this approach, foreseeability, and thus liability, is limited to situations where the business owner is aware of the imminent probability of specific harm to its customer. *See e.g. Cornpropst* v. *Sloan*, 528 S.W.2d 188 (Tenn. 1975); *Page* v. *American Nat'l Bank & Trust Co.*, 850 S.W.2d 133 (Tenn. App. 1991); *Fuga* v. *Comerica Bank-Detroit*, 509 N.W.2d 778 (Mich. App. 1993). Worthen relies on these cases to support its argument that no duty is owed to a business invitee in the circumstances presented by the attack on Boren. This rule as articulated in *Page, supra*, provides that there will be no duty upon business owners to guard against criminal acts of a third party unless they "know or have reason to know that acts are occurring or about to occur on the premises that pose imminent probability of harm to an invitee." Using this approach, it would be virtually impossible to ever hold a financial institution liable for a criminal act occurring at an ATM. Since ATMs are almost always unmanned, the owner would consequently never be aware of a specific "imminent probability of harm" to an invitee.

The second test is the Prior Similar Incidents Test. Courts that have employed this approach have focused on the existence of prior similar incidents to determine whether a particular crime was foreseeable. The duty to police premises found in the Restatement (Second) of Torts is the underpinning of this approach, *See* § 344, cmt. f, *supra; See also Williams* v. *First Alabama Bank*, 545 So.2d 26 (Ala. 1989); *Dyer* v. *Norstar Bank, N.A.*, 588 N.Y.S.2d 499 (1992). In this analysis, the similarity, frequency, location, and proximity in time of the prior incidents are the key elements to be considered. Here, Boren has shown that there was an attack at the same ATM three months before she was attacked. However, courts that have employed this approach have required that the prior similar incidents be more numerous. *See Golombek* v. *Marine Midland Bank, N.A.*, 598 N.Y.2d 891 (1993) (two prior incidents not sufficient to render robbery at night deposit box reasonably foreseeable); *Williams, supra,* (knowledge of two prior robberies at same bank insufficient to determine that robbery of ATM customer was foreseeable); *Nallan* v. *Helmsley-Spear, Inc.*, 407 N.E.2d 451 (N.Y. 1980) (notice of 107 reported crimes on the premises in 21 months preceding assault sufficient to establish breach of duty); *Taco Bell* v. *Lannon*, 744 P.2d 43 (Colo. 1987) (10 armed robberies in three years preceding incident established that harm to customers was reasonably foreseeable). The rationale of this test is perhaps best expressed in *Dyer, supra*:

> The fact that a person using an ATM might be subject to robbery is conceivable, but conceivability is not the equivalent of foreseeability. To hold defendant liable for plaintiff's injury [would be] to stretch the concept of foreseeability beyond acceptable limits. (Citations omitted.)

Thus, even if the prior-similar-incidents test is employed, we are not persuaded that one prior incident at the Baseline ATM is sufficient to establish foreseeability. The requirement of numerosity is discussed in *Premises Liability*, § 49, *supra*:

> For a duty to protect invitees from criminal acts by third persons to arise from prior criminal conduct, the prior crimes must be violent and *sufficiently numerous* and recent to put the landowner on notice that there is a likelihood of danger. . . .

This treatise further provides: "The foreseeability of criminal liability on premises cannot be predicated on a single previous act of violence." *Id*. at § 49.10.

The third and final test is the Totality of the Circumstances Test. This approach to foreseeability is also based on the Restatement (Second) of Torts, however it expands the determination of foreseeability beyond the prior-similar-incidents standard to a consideration of all circumstances surrounding the event. This standard emphasizes the "places or character of the business" language found in the Restatement. *See* § 344, cmt. f, *supra*. The analysis thus includes the nature, condition, and location of the premises, in addition to any prior similar incidents, and a duty can be found where no prior criminal attacks have occurred. *See Torres* v. *United States National Bank*, 670 P.2d 230 (Or. App. 1983); *Isaacs* v. *Huntington Memorial Hospital*, 695 P.2d 653 (Cal. 1985). Courts that employ this standard have found an inherent risk involved in transacting after-hours banking and have painted foreseeability with especially broad strokes, in one instance holding that the robbery of a person using the services of a bank, including an automatic money machine, is clearly foreseeable even where no prior robberies have occurred at that branch. Richard E. Vogel, *Institutional Liability For Attacks On ATM Patrons*, 4 U. Ill. L. Rev. 1009, 1023 n.141 (1994).

This, in our view, is the only test that would allow Boren to establish that Worthen owed her a duty of care. However, we

decline to adopt this approach, as have the majority of jurisdictions that have considered this issue. To do so would result in the imposition of a duty to guard against random criminal acts by third parties, a duty we have heretofore not imposed on any other businesses. We are further persuaded that the policy considerations articulated by the trial court, especially the reluctance to shift responsibility for violent, nonforeseeable, third-party criminal conduct from the government to the private sector, militate against the imposition of this standard. We also cannot say that it would be appropriate as a matter of policy to impose a higher duty on business owners who are willing to provide their services in "high-crime areas" or "near a housing project" — most commonly the areas in which low- and moderate-income residents are to be found.

We hold that two incidents of robbery at Worthen ATMs in the nearly eight years prior to the attack on Boren are not sufficient to impose a duty on Worthen to guard against the criminal acts of a third party.

Affirmed.

GLAZE, J., concurs, CORBIN and BROWN, JJ., dissent, JESSON, C.J., not participating.

ROBERT L. BROWN, Justice, dissenting. The majority holds as a matter of law that a bank owes no duty to protect its Automated Teller Machine customers against criminal activity, even when it is the bank that has invited those customers onto the premises to do business at those machines. The majority, furthermore, makes its decision without adopting or using any standard for assessing under what circumstances a duty of care might be owed, either for this case or for any case in the future. The upshot of this decision is that a bank need do nothing to protect its customers at ATM's where crime has already occurred. It need not provide better illumination, more sophisticated cameras, proximity to well-traveled thoroughfares, or elimination of hiding places. It owes no duty of care. Because I believe that under certain circumstances a duty of care does attach in this unique context where money is dispensed out in the open at all hours of the day or night, the issue of whether the bank was negligent should have been submitted to the jury for resolution.

To be sure, a bank's customer — Boren, in this case — bears a substantial responsibility for her own safety in using an ATM during

off-hours. And a jury might well find that a bank is not predominantly liable for injury caused by a criminal at an ATM because the danger was known or obvious. But that is not the point. The point is whether the bank owed *any* duty to its patrons to act reasonably to minimize criminal activity at the Baseline ATM. I believe that it did and that it cannot completely wash its hands of that duty merely because the danger was criminal in nature.

The facts of this case more than suggest that a climate for crime existed at the Baseline ATM. We have the unique situation of money dispensed outdoors at night without bank employees around for protection. That in itself is a special temptation to the criminal element. We have a previous crime committed at the ATM within three months of the Boren robbery. We have criminal statistics illustrating that this ATM was located in one of the highest violent crime areas of the city. We know that the Baseline ATM was Worthen National Bank's oldest "drive-through" ATM in Little Rock. A security expert raised questions by affidavit about safety factors at this site such as its location away from well-traveled public roads and the insufficiency of the lighting. Surrounding foliage that provided cover for criminals and the inadequacy of the surveillance cameras were other security lapses raised by Boren. Considering these factors, another robbery like Boren experienced was not merely conceivable, it was likely to occur.

Moreover, the aggregate of all of these circumstances leads to the unavoidable conclusion that the bank was aware that a risk to its patrons existed. A duty of care should follow that knowledge. Other jurisdictions have looked to the totality of the circumstances in deciding whether a duty exists. *See Isaacs* v. *Huntington Memorial Hospital*, 695 P.2d 653 (Cal. 1985); *Torres* v. *United States Bank*, 670 P.2d 230 (Or. App. 1983); *see also Sun Trust Banks, Inc.* v. *Killebrew*, 266 Ga. 109, 464 S.E.2d 207 (1995) (Justice Sears concurring). Justice Sears in her concurring opinion in *Killebrew* makes the point precisely:

> Many of the methods for protecting ATM customers are simple and already in place. They include increased lighting and surveillance, placing ATMs in the front of banks, informing customers regarding self-protection, and providing secured enclosures. In fact, in Georgia, increased lighting and customer education are now mandated by law. Finally, a holding that an operator of an ATM has a duty to provide

reasonable protection to its customers is not a holding that a bank is an insurer of its customers. After establishing a duty, an injured customer must still prove that the bank breached that duty and that that breach was the proximate cause of the customer's injuries.

266 Ga. at 112, 464 S.E.2d at 210.

What apparently drives the majority to its conclusion is the worry that assessing some duty of care against the bank in this case will open the floodgates to a torrent of litigation against all businesses. That fear is unfounded. This case involves only Automated Teller Machines and the bank's responsibility to take some action to safeguard its business customers and to minimize criminal activity at that location. The ATM method of doing business cannot equate to that of a convenience store or to other merchandizing establishments. None of those businesses dispenses money out in the open at all hours of the night without people being present. ATM's, in short, are a unique experiment.

Nor am I persuaded that requiring some protective action by the bank (lighting, cameras, elimination of hiding places) shifts the responsibility to protect against crime from the public to the private sector. It merely requires the bank to be sensitive and sensible with respect to the people with whom it does business. Such protective action falls into the category of pure common sense. And it is essential in this day and age. I have no doubt that customers of the Baseline Road ATM who live in the area would welcome better lighting and cameras and a more secure setting so that they can do business during off-hours with an enhanced sense of safety.

The majority's argument is that the bank should not be saddled with the burden of protecting against unexpected criminal activity. But criminal activity is a "dangerous instrumentality" that was reasonably anticipated in this context and should have been minimized by some protective action. The *Restatement (Second) of Torts* clearly supports a duty of care under these circumstances. *Restatement (Second) of Torts*, § 344, Comment f, pp. 225-226 (1965). Moreover, this court has placed a duty on businesses in other situations where the peril was known to exist, albeit hidden, even when the visitor was on the premises as a mere licensee as opposed to a business invitee. *See, e.g., Lively* v. *Libbey Memorial Physical Medicine Ctr., Inc.,* 311 Ark. 41, 841 S.W.2d 609 (1992). Perhaps

protective action was taken by the bank. But we do not know one way or the other. Thus, it is an issue that should be litigated.

In granting Worthen National Bank's motion for summary judgment, the trial court invoked *Page v. American Nat. Bank & Trust Co.,* 850 S.W.2d 133 (Tenn. Ct. App. 1991); *Cornpropst v. Sloan,* 528 S.W.2d 188 (Tenn. 1975); and *Goldberg v. Housing Auth. of Newark,* 38 N.J. 578, 186 A.2d 291 (1962), in its letter opinion as well as *Bartley v. Sweetser,* 319 Ark. 117, 890 S.W.2d 250 (1994). That authority is not controlling. The majority opinion appropriately discounts the landlord-tenant case of *Bartley v. Sweetser, supra,* and further correctly declines to accept or adopt the specific harm test used by the Tennessee Court of Appeals in *Page v. American Nat. Bank & Trust Co., supra,* and by the Tennessee Supreme Court in *Cornpropst v. Sloan, supra.* In addition, the 1962 case of *Goldberg v. Housing Auth. of Newark, supra,* dealt with the duty to provide police protection in a housing project. Not only is that case categorically different from an ATM case, but the precise issue of providing police protection is not before us. The issue in the instant case is whether *any* duty of care was owed to minimize the potential for a criminal incident.

I believe that a duty was owed, and for that reason I respectfully dissent. Whether the bank satisfied its duty in this case and whether Boren placed herself in a precarious situation that was known and obvious were issues for the jury to resolve.

CORBIN, J., joins.