JoKatherine H. PAGE and Jason W. Page, a minor, b/n/f JoKatherine H. Page, Plaintiffs–Appellees,

v.

AMERICAN NATIONAL BANK & TRUST COMPANY, Defendant–Appellant.

CA No. 03A01–9102–CV–64.

Court of Appeals of Tennessee, Eastern Section.

July 10, 1991.

Permission to Appeal Denied by Supreme Court March 1, 1993.

Donald E. Warner and J. Frank Thomas, with Leitner, Warner, Moffitt, Williams, Dooley, Carpenter & Napolitan, Chattanooga, for defendant-appellant.

Scott N. Brown, Jr., and David B. Kesler, with Brown, Dobson, Burnette & Kesler, Chattanooga, for plaintiffs-appellees.

## OPINION

SANDERS, Presiding Judge, Eastern Section.

The Defendant has appealed a jury verdict holding it liable for personal injuries received by the Plaintiffs from a sudden criminal assault by third parties while on Defendant's property.

The American National Bank & Trust Company (Bank) is a national banking institution doing business in Hamilton County where it operates a number of branches and some thirteen 24–hour automated teller machines (ATMs). It issues a coded card to its customers and by use of that card a customer can draw up to $300 in cash from his deposit in the Bank at any time, day or night. The Plaintiff–Appellee, JoKatherine Page, was a customer of the Bank and held an ATM card. On December 7, 1988, at approximately 9:30 p.m. Mrs. Page went to the Brainerd Road branch of the Bank to use the ATM, as she had done on numerous occasions before. Mrs. Page was accompanied by her 14–year–old son, Plaintiff–Appellee Jason Page. She parked her automobile near the ATM and got out to make a withdrawal, leaving Jason in the car. There were two other patrons near the ATM, one being a Mrs. Kurtz who was an acquaintance of Mrs. Page's. As they were talking, they were approached by a group of four to six young black males. One of the men pushed Mrs. Page toward the ATM machine while holding an object, presumably a gun, to her back and demanded she withdraw $300 from the ATM. Two others stood at the car with a gun pointed at Jason, threatening to kill him if Mrs. Page did not cooperate. When she turned to tell Jason to stay in the car, the man behind her struck her in the face with a solid object, knocking her down and severely injuring her face.

The Plaintiffs sued the Bank for personal injuries and, as pertinent here, the complaint alleged:

"The plaintiffs aver that the defendant committed one or more of the following acts of common law negligence, which either alone or combined and concurring with the statutory violations set forth below, constitute the direct and proximate cause of the plaintiffs' injuries:

"(a) The lighting at and about the ATM was completely inadequate to deter crime.

"(b) The defendant knew that the area in which it placed the ATM was unsafe and failed to warn plaintiffs.

"(c) The defendant failed to exercise reasonable care to protect its customers, including plaintiffs, from assaults when such assaults were or should have been reasonably foreseeable.

"(d) The machine was designed by defendant or its agents in such a way that the plaintiff, JoKatherine Page, was required to leave the safety of her automobile to use the machine.

"(e) The defendant knew that this machine was located in an area of potential risk to its customers and was aware of prior similar incidents at other branches of ANB and at branches of other banks in the same area in which defendant's Brainerd branch is located. Despite such knowledge, defendant failed to take necessary and reasonable steps to correct the deficiencies of which it was aware, all in a conscience [sic] and callous disregard of the welfare of the defendant's customers, including plaintiffs.

"(f) Defendant failed to place a guard at the ATM or to take such other security precautions as were reasonably necessary to protect the defendant's customers, including plaintiffs.

"(g) Defendant failed to conform to the actions of a reasonably prudent bank operator in similar situations.

"(h) Defendant failed to provide its customers, including plaintiffs, a safe place in which to conduct their business with the defendant.

"(i) Defendant failed to establish or follow standards of safety recognized in the banking industry."

The complaint further alleged Defendant violated federal regulations pertaining to safety features about the ATM found in the Code of Federal Regulations (CFR). Because Defendant's deposits are insured by the Federal Deposit Insurance Corporation, it is subject to these regulations. The alleged regulations violated are, specifically:

12 CFR 21.4(b)(1)—requiring a bank to establish a schedule for the inspection, testing and servicing of all security devices installed in each banking office and to designate a security officer with those duties and to keep a record of such inspections, testings, and servicings;

12 CFR 21.4(b)(7)—requiring bank to designate a person responsible for assuring that all security devices are turned on;

12 CFR 21.5(a)—requiring bank to complete compliance reports certifying to its compliance with security requirements;

12 CFR 21 Appendix A—requiring that security devices be inspected, tested, and serviced by competent persons;

Appendix A(1)(iii)—requiring installation of cameras which can take identifiable images of persons transacting business;

Appendix A(4)(V)—requiring that an ATM be "protected by a burglar alarm and located in a well-lighted area. Alternatively, cash dispensing machines should be so designated and constructed as to afford at least equivalent burglary resistance. (ft. 6)." Footnote 6 states: "Equivalent burglary resistant materials for cash dispensing machines include the use of $3/8$ inch thick nickel stainless steel meeting American Society of Testing Materials designation A167–70, Type 304, in place of 1 inch thick steel, if other criteria are satisfied." (Emphasis ours.)

The Bank, for answer, admitted the Plaintiffs were assaulted by unknown assailants. It denied it owed a duty to protect the Plaintiffs from the intentional criminal acts of third parties. It denied it was guilty of any acts or omissions which

constituted negligence. It denied it violated any federal regulations as alleged in the complaint. As affirmative defenses, it alleged the Plaintiffs assumed the risk and the intentional criminal acts of the unknown third parties were the sole, direct, and proximate cause of Plaintiffs' injuries.

The Bank filed a motion to dismiss pursuant to Rule 12.02(6) and/or a motion for summary judgment. The motion was overruled and the case proceeded to trial. At the conclusion of the Plaintiffs' proof and the conclusion of all the proof, the Bank moved for a directed verdict, but the motions were overruled.

The jury found the issues in favor of the Plaintiffs. It fixed Mrs. Page's damages at $125,000 and Jason's damages at $10,-000.

The Bank filed a motion for judgment notwithstanding the verdict and a motion for a new trial or, in the alternative, for a remittitur. They were overruled and the Bank has appealed, presenting the following issues for review: 1. Whether the trial court erred in not granting a directed verdict and/or JNOV in favor of defendant/appellant—(a) Under which circumstances does ANB owe a duty to protect business invitees from personal injury caused by the intentional criminal acts of unknown criminal assailants? (b) Whether the proximate cause of Plaintiffs' injuries was the independent, superseding intentional acts of unknown criminal assailants; 2. Whether the court erred, over Defendant's objection, by failing to submit Defendant's proposed jury charge(s) on the correct legal duty owed by Defendant to Plaintiffs; 3. Whether the court erred, over Defendant's objection, by refusing to charge the jury on the doctrine of assumption of the risk as submitted by Defendant's counsel; 4. Whether the court committed reversible error, over objection of the Defendant, and without any evidence in the record, by charging the jury on loss of wages and loss of earning capacity and by permitting the Plaintiffs' counsel to argue a claim for loss of earning capacity and lost wages in the amount of $42,500.

In support of its insistence that the court erred in not granting a directed verdict and/or judgment not withstanding the verdict, the Bank argues this case is controlled by the holdings of our supreme court in the case of *Cornpropst v. Sloan,* 528 S.W.2d 188 (Tenn.1975). We agree, and reverse.

In *Cornpropst* the plaintiff had gone to a shopping center after dark. After doing her shopping she was returning to her car to leave when a man she had never seen before suddenly drove up beside her car and grabbed her and inflicted injuries to her while trying to force her into his car. Plaintiff filed suit for personal injuries against the merchants and owners who comprised the shopping center association. She alleged they were negligent in failing to furnish her a safe place to shop. Prior to this attack upon the plaintiff there had been committed various crimes, assaults, and other acts of violence either on the premises or in the vicinity. She said defendants failed to furnish security guards for the area; they knew or should have known the parking lot was dangerous, especially for a woman after dark; they were negligent in failing to warn of the potential dangers of the area. She alleged numerous acts of nonfeasance similar to Plaintiffs' complaint in the case at bar. The trial court sustained a Rule 12.02(6), T.R.C.P., motion to the complaint and the supreme court affirmed on appeal. In doing so the majority of the court, speaking through Chief Justice Fones, said:

> At common law, a private person or corporation, as distinguished from governmental units, had no duty whatsoever to protect others from the criminal acts of third parties. That general rule has remained steadfast in the tort law of this country, despite the exceptions that have appeared from time-to-time, where special relationships and special circumstances have combined to impose liability.

> We are dealing with an act of nonfeasance, the failure to take steps to protect another from harm, as distinguished

from misfeasance, or active misconduct causing positive injury to others.

*Id.* 191.

The cases involving liability for the criminal acts of third persons are most numerous involving the innkeeper guest relationship and the patron public amusement owners and operators, including lounges, beer parlors, rock and roll concerts, bowling alleys, etc. In the great majority of cases involving these relationships the offender that perpetrates the criminal act giving rise to the litigation is identified in advance, and liability is predicated on some action or course of conduct of the particular offender that gave notice of the imminent probability of danger.

In the instant case the offender was not, and under the allegations of the bill, could not have been identified in advance of the perpetration of the action (see allegations to paragraph five [5] of the complaint). The complaint relies entirely upon the vague allegation that various crimes, assaults and other acts of violence had been committed either on the premises or in the immediate area.

Vagueness is only one of the factors that have perplexed the courts in dealing with tort liability for criminal acts of third persons.

*Id.* 192.

In addressing the vagueness of duties imposed on a premises owner to prevent intentional criminal acts upon its premises, the court quoted with approval from the Supreme Court of New Jersey in its reversal of a case holding the housing authority liable to a plaintiff who was beaten and robbed while delivering milk to a tenant in the project. In *Goldberg v. Housing Authority*, 38 N.J. 578, 186 A.2d 291, 10 A.L.R.3rd 595 (1962) the court said:

The second consideration is the inevitable vagueness of the proposed duty. Fairness ordinarily requires that a man be able to ascertain in advance of a jury's verdict whether the duty is his and whether he has performed it. To which multi-family houses would the duty apply? Would it depend upon the number of tenancies? If so, can we now fix the number? And if the duty springs from a combination of tenancies and prior unlawful events, what kind of offenses will suffice, and in what number, and will crimes next door or around the corner or in the neighborhood, raise the obligation? And if a prescient owner concludes the duty is his, what measures will discharge it? It is an easy matter to know whether a stairway is defective and what repairs will put it in order. Again, it is fairly simple to decide how many ushers or guards suffice at a skating rink or a railroad platform to deal with the crush of a crowd and the risks of unintentional injury which the nature of the business creates, but how can one know what measures will protect against the thug, the narcotic addict, the degenerate, the psychopath and the psychotic? Must the owner prevent all crime? We doubt that any police force in the friendliest community has achieved that end.

\* \* \* \* \* \*

... We assume that advocates of liability do not intend an absolute obligation to prevent all crime, but rather have in mind some unarticulated level of effectiveness short of that goal. Whatever may be that degree of safety, is there any standard of performance to which the owner may look for guidance? We know of none, and the record does not suggest one, and we are at a loss to understand what standard the jurors here employed. The charge to the jury was unrevealing; it simply left to 12 men and women the task of deciding whether a prudent owner would have done more, and whether, if defendant had, the robbers here would likely have been deterred.

In *Cornpropst*, Justice Henry filed a dissent in which he said he would have held liability under Restatement (Second) of Torts, Section 344, which reads as follows:

Sec. 344. Business Premises Open to Public: Acts of Third Persons or Animals.

A possessor of land who holds it open to the public for entry for his business pur-

poses is subject to liability to members of the public while they are upon the land for such a purpose, for physical harm caused by the accidental, negligent, or intentionally harmful acts of third persons or animals, and by the failure of the possessor to exercise reasonable care to

> (a) discover that such acts are being done or are likely to be done, or

> (b) give a warning adequate to enable the visitors to avoid the harm, or otherwise to protect them against it.

In response to this dissent, the majority in *Cornpropst* said:

> [I]n our opinion it is patently unfair and unjust to impose the vague duty of Section 344 Restatement of Torts (Second) on the shopkeepers and merchants of Tennessee, as the minority of this Court proposes, for the sudden criminal acts of unknown and unidentified persons.

*Id.* 195.

In our opinion it is a mistake to equate the duty of shopkeepers with respect to criminal acts with the duty of shopkeepers with respect to careless acts. Section 344 of the Restatement of Torts (Second) places both acts in exactly the same category in comment f.

We are concerned in this case with the liability of the business establishments in Eastgate Shopping Center for the sudden criminal act of a temporarily or permanently depraved person, who according to the affirmative allegations contained in the complaint gave no notice by word, act, dress or deed prior to the commission of the attack that would have indicated to anyone an intention of purpose to commit an assault.

\* \* \* \* \* \*

In our opinion the appropriate rule applicable to this case is as follows: There is no duty upon the owners or operators of a shopping center, individually or collectively, or upon merchants and shopkeepers generally, whose mode of operation of their premises does not attract or provide a climate for crime, to guard against the criminal acts of a third party, unless they know or have reason to know

that acts are occurring or about to occur on the premises that pose imminent probability of harm to an invitee; whereupon a duty of reasonable care to protect against such act arises.

*Id.* 197, 198.

The Appellees argue in their brief that the rule pronounced by the supreme court has no application to the case at bar in that it is applicable only to owners and operators of a shopping center. They attempt to substantiate this argument by quoting a portion of the last paragraph quoted immediately above and omitting an integral part of the quote. At page 15 of their brief Appellees state: "Finally, the plaintiffs in this case have stated a claim under the *Cornpropst* rule, and there is material evidence in the record to support a jury verdict even under *Cornpropst.* The rule itself states that the general rule of nonliability only concerns those 'owners and operators of a shopping center ... whose mode of operation of their premises does not attract or provide a climate for crime....' *Cornpropst v. Sloan,* 528 S.W.2d 188, 198 (Tenn.1975)." The portion of the quote omitted immediately following "owners and operators of a shopping center" is "individually or collectively, or upon merchants and shopkeepers generally." (Emphasis ours.)

A fair reading of *Cornpropst* makes it abundantly clear that the supreme court intended for the rule therein stated to be applicable to merchants and shopkeepers except where a different standard has been adopted· for institutions such as carriers, utilities, innkeepers, etc., as recognized in the opinion of the court. The court made it clear also that it was not its purpose to make an all-inclusive rule. It said:

> We are not called upon, in this case, to draft a rule applicable to all of the many types of business and entertainment and service establishments or of every premises liability, or special relationship situation wherein a duty of protection of invitees might be asserted, and we do not propose to do so.

*Id.* 198.

Appellees also insist the Bank does not fall within the class of businesses governed

by the *Cornpropst* rule because its mode of operation attracts and provides a climate for crime. In their brief they state: "American National Bank's Brainerd Branch ATM both attracts and provides a climate for crime. The plaintiffs provided ample evidence to support this claim by showing:

"1. Five similar previous crimes at the very same branch's ATM.

"2. Two letters from the Chattanooga Crime Prevention Bureau specifically addressing the fact that the drive-in area adjacent to the Brainerd Branch ATM provided thieves with a 'good place to hide and grab money.'

"3. A previous warning from a customer who was assaulted and shot at the exact same ATM about the dangerous situation at that location.

"4. The ATM at the Brainerd Branch is on the side of the building, shielded from the line of sight of east-bound traffic by a sharp curve away from the building, and largely obstructed from the west by the large American National Bank sign, a tall retaining wall, and other obstacles.

"5. On the night of the assault, the area about the ATM was not well lighted as required by federal regulations. In fact, the area where the assailants hid was not lighted at all and provided the exact hiding place warned of by the Chattanooga Crime Prevention Bureau.

"6. The ATM was located in a high-crime area."

In light of our holding in this case, we must concede the Plaintiffs proved each of these allegations to the complete satisfaction of the jury but, even so, that does not take the Bank out of the rule of *Cornpropst*. Let us conclude that the jury found the Bank was careless or negligent based on the proof in support of these allegations. The court in *Cornpropst* said: "In our opinion it is a mistake to equate the duty of a shopkeeper with respect to criminal acts with the duty of shopkeepers with respect to careless acts." The proof did show there had been five robberies at the ATM over a four-year period; two of them

occurred in 1984, one in 1986, one in 1987 and one in 1988. It is interesting to note that three of the five occurred during the day and two occurred at night.

In *Cornpropst* the court addressed the issue of prior crimes committed on the premises in response to the appellants' contention that the case of *Corbitt v. Ringley–Crockett, Inc.*, 496 S.W.2d 914 (Tenn.App. 1973) supported their position. The court disagreed, saying:

In *Corbitt*, plaintiff was assaulted in a restroom at the Civic Coliseum in Knoxville. The Court of Appeals announced the following rule in that case:

"We hold that if the owner is to be held liable for the sudden criminal acts of third persons there must be a showing that the owner was on notice in some manner of the imminent probability of the act. Otherwise, there can be no issue for jury determination...."

In subjecting the brief rule stated in *Corbitt* to analysis for guidance in this case the question arises whether the rule requires notice of the imminent probability of an act by the particular offender who commits the act, or would the occurrence of various criminal acts at unspecified times prior to the act in suit suffice? If the latter, how many criminal acts are necessary to invoke the duty to warn and how many are necessary to impose the duty to hire a private police force? Is the Court to determine the number, or is the jury to be permitted to speculate upon the appropriate number of criminal acts to give rise to the duty? Is it not also appropriate to consider the time element? After a lapse of six months, one year or two years without an incident or a criminal act, can a merchant disband his private police force?

*Id.* 197.

The evidence relating to item No. 2 above is that in 1985 the Bank requested the Crime Prevention Bureau of Chattanooga to make a survey and recommendations concerning security of all its ATM locations (Teller–24). After making the survey the director of the Bureau wrote the Bank a letter which, as pertinent here, stated:

"Sam Morris of our office did surveys on all Teller–24 locations. We found the locations well secure as far as lights and visibility..... The drive-in at 3535 Brainerd Road, the extension at 4614 Highway 58 and the slope of the building at 8191 E. Brainerd Road are good places for someone to hide and grab money."

There is no proof the unknown assailants had been hiding in the vicinity of the ATM prior to the assault.

In connection with No. 3 above, the Plaintiffs called Mr. Randall Price, who was a victim of an assault at the ATM. He testified that after his experience he talked to one of the vice-presidents of the Bank and, as pertinent here, he made the following recommendation: "I made a suggestion, as one having been in a situation like I was, that they might ought to at least consider looking at their security a little bit more. And my main suggestion was they put up a lot more lights because I felt like that was why I didn't see him there when I pulled up."

As far as No. 4 above is concerned, Plaintiffs offered an expert witness who testified that, in his opinion, the ATM was located on the wrong side of the building because it was shielded from the line of sight of street traffic.

In No. 6 above, the Plaintiffs say "The ATM was located in a high-crime area." We assume it is their contention it is negligence per se to do business in a high-crime area. *Cornpropst* cites the case of *McMillin v. Barton–Robison Convoy Company*, 182 Okl. 553, 78 P.2d 789 (Okl.1938). In *McMillin* the plaintiff, as next of kin of the deceased, brought suit against deceased's employer. The deceased was killed during a robbery on the employer's property. Liability was predicated on the business's being conducted in a high-crime area where 80% of all crime in the county was committed. The Supreme Court of Oklahoma, in response to those contentions, said:

> We are unable to see that an employer has a general duty to protect his employees from the assaults of criminals. We are likewise unable to see that there are any exceptional circumstances in this

case which would give rise to such a duty. To so find would be tantamount to saying that the town of Picher is a condemned community. We would be saying, in legal effect, that those who live there and those who engage in business there are not exercising the prudence and judgment of ordinary people. To hold what the plaintiffs want us to hold would result in saying that every business man in the town of Picher is guilty of negligence toward those he employs and is answerable to them for their damages suffered as a result of the act of some criminal.

As for No. 5 above, the record fails to support this contention by the Appellants. The record is devoid of any evidence that the assailants were hiding on the premises prior to their assault on the Plaintiffs. Also, the record fails to show there is any federal regulation governing the amount of lighting required for an ATM. Appendix A(4)(v) to 12, CFR, provides an ATM be "protected by a burglar alarm and located in a well-lighted area. Alternatively, cash dispensing machines should be so designated and constructed as to afford at least burglary resistance (ft. 6)." (Emphasis ours.)

The CFR relating to ATMs, 12 CFR Appendix A4(v), provides for certain minimum safety standards. That section requires the storage chest, door to storage chest, housing covering the storage and deposit chest be made of certain specifications of steel. This section also requires the machine to weigh a certain amount or be well anchored. It also states the machine should be placed in a well-lighted area, but such placement is not mandatory. Instead, the statute allows an alternative design which affords at least equivalent burglary resistance. 12 CFR 21 Appendix A(4)(v). It is clear these provisions were not intended to reduce the number of assaults on patrons using an ATM or to enhance protection of those patrons. The regulations instead focus on preventing the ATM itself from being burglarized.

■ In the case at bar the Plaintiffs cannot rely on the CFRs to predicate liabili-

ty. Before a plaintiff can base an action on the violation of a statute, he or she must be within the class of persons the statute was intended to protect. In the case of *Traylor v. Coburn,* 597 S.W.2d 319 (Tenn.App.1980) the court said:

It is a well settled proposition of law that failure to perform a statutory duty is negligence per se, and if injury is the proximate result or consequence of this negligent act, there is liability. However, the person suing must be such a person as is within the protection of the law and intended to be benefited thereby. *Berry* [*v. Whitworth,* 576 S.W.2d 351 (Tenn.App.1978)] *supra.* In the case of *Carter v. Redmond,* 142 Tenn. 258, 218 S.W. 217 (1920) the Supreme Court of this State, quoting from an earlier opinion, held as follows:

"In order to found an action on the violation of a statute, or ordinance, ... the person suing must be such a person as is within the protection of the law and intended to be benefited thereby.... We think that one not a beneficiary of a statute may neither base an action nor a defense on a violation thereof. Unless an individual be within the province of a statute, its violation is no breach of duty to him. *Chattanooga Ry. & Lt. Co. v. Bettis,* 139 Tenn. 332, 202 S.W. 70."

Stated another way, violation of a statute will not create liability unless it appears "the statute was intended to prevent such accidents as that for which redress is sought." *Chattanooga Ry. & Light Co. v. Bettis,* 139 Tenn. 332, 202 S.W. 70 (Tenn. 1917), 337–8.

In the case at bar we hold, as the supreme court held in *Cornpropst,* that the sudden intentional criminal acts of the unidentified assailants, which could not have been prevented or deterred by the exercise of reasonable care by the Bank, was the sole proximate cause of harm to the Plaintiffs. We hold the trial court was in error in not sustaining Appellant's motion for a judgment notwithstanding the verdict. In view of our holding on this issue, the remaining issues are pretermitted.

The judgment of the trial court is reversed and the complaint dismissed. The cost of this appeal is taxed to the Appellees and the case is remanded to the trial court.

GODDARD, J., and WILLIAM H. INMAN, Special Judge, concur.