Darryl **GODFREY**, Plaintiff,

v.

**BODDIE–NOELL ENTERPRISES, INC.,** t/a Hardee's of Norfolk, Defendant.

Civ. A. No. 2:92cv1318.

United States District Court, E.D. Virginia, Norfolk Division.

Feb. 9, 1994.

Steven Paul Letourneau, Morris Heller Fine, William Brice Smith, Fine, Fine, Legum & Fine, Virginia Beach, VA, for plaintiff.

Randolph Courtland DuVall, Pender & Coward, Virginia Beach, VA, for defendant.

### OPINION AND ORDER

DOUMAR, District Judge.

Darryl Godfrey brought this suit against Boddie–Noell Enterprises, Inc., trading as Hardee's of Norfolk. Godfrey claimed that Boddie–Noell should be liable to him for injuries he sustained during an assault that occurred on Hardee's premises. On or about June 10, 1990, at about 3:00 a.m., an unknown third party assaulted Godfrey and shot him while he was in the parking lot of the Hardee's.

The case was tried by a jury and the jury returned without being able to reach a verdict and the Court declared a mistrial. The matter is now before the Court on the defendant's renewed motion for judgment as a matter of law and the on the plaintiff's motion for a new trial by jury. For the reasons discussed below, the defendant's motion for judgment as a matter of law is GRANTED and judgment is entered for the defendant.

#### I. Facts and Procedural History

Hardee's is a national fast food restaurant franchise operation. The Hardee's where this incident took place is owned and operated by the defendant Boddie–Noell Enterprises, Inc., which operates 280 Hardee's franchises in Virginia and North Carolina, with 53 of those located in southeastern Virginia. Boddie–Noell has a contract with Key Security, an independent security agency which is not a party to this action, to provide security or guard service at 15 of the franchised restaurants in this area. The Key Security guards reported to the Hardee's manager on duty and were to follow site instructions pre-

pared by Key Security in consultation with Boddie–Noell.

This Hardee's is located on the north side of Princess Anne Road just a short block west of Azalea Garden Road in the City of Norfolk, Virginia. These streets are major thoroughfares and well-trafficked. In this area, Princess Anne Road is a divided four-lane highway with two lanes running east separated by a grass island and two lanes running west.

The Hardee's in question is surrounded by residences, businesses, and a church. Directly to the west of Hardee's on the north side of Princess Anne Road is a church. (Exhs. 4R and 4H). The area to the north and east of Hardee's are single family residences and apartments (Exhs. 4I, 4K, 4M and 4P). Immediately to the east across a side street, a strip-type shopping plaza abuts Princess Anne Road. (Exh. 4S). Opposite this Hardee's on the south side of Princess Anne Road is a branch of the First Virginia Bank which has approximately four drive-in window passages which diagonally face Princess Anne Road. (Exh. 4L). The area to the south of the bank is a modern industrial park.

At this Hardee's, customers using the drive-through enter on the east side of the restaurant and drive around the building to exit onto Princess Anne Road on the west side of the building. The order board is on the northeast back corner of the building, situated diagonally. The drive-through pickup or delivery window is about two car lengths up from the order board on the west side. When a car is at the order board, you can see the front part of it from the delivery window. The parking lot and drive-through area are surrounded by flood lights.

In the early morning of June 10, 1990, the plaintiff, Darryl Godfrey, his wife, and several of their friends were looking for something to eat after spending the evening together dancing. The group was traveling in three separate cars. Darryl Godfrey and two male friends, Sloan and Nutt, were in a car driven by Darryl's wife Angela. Darryl's brother-in-law, Dallas Harrel, was driving himself. Three women friends were in another car, driven by their friend Tammy Booth–Wood.

The club they had been at, Barry's, closed around 2:00 a.m. and they decided to find a place for "breakfast." They stopped at two restaurants, Denny's and Lum's, but both of those were too crowded. At that time, Dallas Harrel suggested that they try the Hardee's at Princess Anne Road. He had been to the Hardee's on prior occasions and knew it was also open late at night.

At approximately 3:00 a.m. on Sunday morning, June 10, 1990, they arrived at Hardee's. The parking lot and drive-through area were well lighted. Dallas Harrel was in the lead vehicle and pulled into the drive-through lane. Harrel had ordered at the order board and proceeded to the delivery window. While picking up his order at the delivery window, Harrel was engaged in a conversation with Hattie Winfield, an acquaintance of Harrel's who happened to be the Hardee's employee working the drive-through that night. Harrel, who did not testify, was reportedly waiting at the delivery window because he was going to pay for the orders placed by his friends in the other two automobiles. Normally, when a vehicle is at the delivery window, there is sufficient space for two vehicles between the vehicle at the delivery window and the vehicle at the order board.

Darryl and Angela Godfrey and their two friends, Sloan and Nutt, were in the Godfrey's car at the order board. On the night in question when Harrel was at the pickup window speaking with Hattie Winfield, there were no vehicles in the spaces between Harrel's automobile and the automobile occupied by the Godfrey's. Tammy Booth–Wood and the other two women were in line in their vehicle immediately behind the Godfrey's.

Tammy Booth–Wood testified [1] that when they pulled into the Hardee's drive-through, the women in her car rolled up their windows to just a crack. However, while they were in line, a young man approached them. Booth–

1. Ms. Booth–Wood's testimony was offered via *bene esse* deposition because she was expecting a baby at the time of these proceedings.

Wood described him as a nice-looking guy, clean cut, wearing tailored clothes and jewelry. According to her testimony, he talked to them for five to ten minutes. Meanwhile, six or seven of his friends were standing back, about eight to ten feet away, "coaxing" him.

At some point Booth–Wood and her passengers decided they did not want to speak to this man anymore and they blew their horn to get the attention of Darryl, Sloan, and Nutt in the car in front of them. Darryl Godfrey then got out of his car and walked back to this individual and politely asked him to stop bothering his friends. Sloan and Nutt stayed back by the car at the order board. According to both Tammy Booth–Wood and Godfrey, himself, he was calm and not confrontational. He politely asked the men to leave the women alone as they "weren't interested." Darryl Godfrey and the clean-cut young man shook hands and the man and his friends walked away. Godfrey returned to his vehicle.

According to the Tammy Booth–Wood's testimony, about five more minutes passed, and then the car was again approached. This time, about seven or eight men, twenty-one years old at most, began disturbing the three young ladies in the car. Booth–Woods stated that the men were very hostile, acting like animals, jumping on the car and shaking it. Booth–Woods "laid on the horn" and Darryl again got out of his car. At this time, the Godfrey's and Sloan and Nutt had still not placed their order, although they had already been at the order window for some time.

According to the testimony, as Darryl approached the car, Tammy Booth–Wood got out of her car. At about the same time, several of the men rushed Darryl and at least one threw a punch at him. Angela Godfrey had stepped out of her car and was yelling at Darryl to get back in the car and began pulling him back into the car. Darryl was an athletic type who had tried out for a professional football team. Then, one of the men evidently pulled a pistol and without warning shot Darryl in the stomach. The plaintiff ended up on the opposite side of Princess Anne Road across the east and west bound lanes and in the parking lot of the First Virginia Bank on the south side of Princess Anne Road.

Hattie Winfield, the young woman at the drive-through window, testified that immediately before the shooting she heard something like "fussing" coming from the speaker but nothing unusual occurring. After that, she heard some shots. She never saw the vehicle occupied by the plaintiff, although the front of the vehicle should have been visible from her window. Nor were there any vehicles in the two spaces between Harrel's vehicle and the space at the order board.

Tammy Booth–Woods testified that this entire incident took between fifteen and twenty minutes. Angela Godfrey testified that she was at the order board for five to ten minutes and that no one ever asked for her order nor did she give it to anyone. Testimony suggested that the interior of the restaurant was crowded at the time. Two security guards were inside the Hardee's; one was at the counter and one was at or near the door of the establishment.

Plaintiff tried the case on a theory of premises liability. Plaintiff offered testimony from security guards, police records, and Hardee's employees that there had been other incidents or disturbances at or near this Hardee's. There are several clubs in the area, and generally on Saturday and Sunday mornings at approximately 2:00 a.m., the Hardee's becomes crowded with patrons who come from the clubs. Hardee's employees refer to them as the "club crowd." These clubs cater to predominantly African–American groups. All of the individuals involved in this incident were African–Americans. According to testimony from Hardee's employees, at least one of the clubs is known to have an under-age audience which illegally obtains or uses alcohol at or outside of that particular club. The Hardee's serves no alcoholic beverages of any kind. Testimony suggested that arguments which may have begun at these clubs are sometimes renewed when the clubs close and the patrons move to Hardee's.

Police records reflect that approximately twenty-nine calls were made to the police during the eighteen months prior to this

incident for incidents or disturbances in or near the Hardee's restaurant.[2] These records provide very little detail of what actually inspired the calls or how they were resolved.[3] Incident reports prepared by the security guards and restaurant managers during this time period describe some episodes in more detail.[4] The evidence suggests that in some incidents, the guard took care of problems without calling on the police.

Between June 1989 and January 1990 while there was only one security guard at the location, the reports indicate in detail eight incidents including a scuffle with the guard and a customer who threatened to kill the manager. In January 1990, one of the security guards indicated in her report that "these people are armed, well armed." In response to her concerns, an additional security guard was recommended by Key Security, and the defendant agreed that a second security guard would be placed on duty on Friday and Saturday nights and in the early morning hours thereafter.

After two guards were on duty, the rate of incidents appears to have gone down slightly. The total police calls dropped to only three in the six months prior to this incident, as opposed to thirteen and sixteen calls in the two six-month periods preceding. Incident reports filed by the guards also show that in the six-month period prior to the night of the incident in question, only three incidents occurred. On January 16, 1990, there was an episode of suspected drug dealing. On May 2, 1990, an irate drive-through customer got out of his car and came into the restaurant, shouting and cursing at the employees. This customer had a .22 caliber pistol in a holster which he brandished before the guard disarmed him. Later in May, the guards prevented a fight from starting between two groups of men in the parking lot, but no weapons were involved.

Plaintiff offered an expert who testified that although one guard was sufficient prior to the year 1990, there should have been at least two guards after 1990. This expert further indicated that there probably should have been three guards on duty on the night in question, and that at least one guard should have been posted outside in the parking lot. Alternatively, this expert suggested that there should have been some means of visual surveillance of the parking lot area behind the restaurant.

The site instructions for the guards issued by Key Security required them to patrol the outside of the premises every thirty minutes unless the inside was too busy. On the night of the incident, the guards on duty testified that they regularly patrolled the outside of the restaurant. Tammy Booth–Wood, Angela Godfrey, and Darryl Godfrey all testified that they did not see a security guard during the time they were in the drive-through line which may have been as long as twenty minutes.

At the end of the plaintiff's case-in-chief and again at the close of all of the evidence, the defendant moved for judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure. The Court granted that motion in part, finding that there was insufficient evidence for a jury to find that the defendant knew that the assault was occurring or about to occur on the premises.[5]

The primary issue which the Court submitted to the jury was whether Hardee's "method of business" attracted or provided a climate for assaultive crimes. If the jury so found, they would have then had to deter-

---

2. The records custodian from the police testified that these calls did not necessarily result from incidents on the Hardee's premises, but from somewhere in the immediate vicinity.

3. The police call records include only a code number indicating in a very general way what the nature of the call was. Most of the codes in this case were for "disturbances." The custodial officer testified that disturbances can range from a fight to some children playing loudly in the parking lot.

4. Nine incident reports for the one year period preceding the Godfrey shooting were admitted into evidence. While testimony suggested that there was overlap in the incidents indicated by police calls and the incidents described in internal incident reports, it was never made clear exactly to what extent the incident reports reflect the same material as the police calls.

5. Awareness of an imminent assault is the second prong of the test articulated in *Wright v. Webb*, 234 Va. 527, 532, 362 S.E.2d 919, 922 (1987), which is discussed *infra*.

mine whether Hardee's breached its duty of care to the plaintiff and whether this breach was a proximate cause of the plaintiff's injury. After some four hours of deliberation, the jury declared itself hopelessly deadlocked.[6] At that time, the defendant renewed its motion for judgment as a matter of law pursuant to Rule 50. The Court ordered the parties to brief the issue of what evidence should be sufficient under *Wright v. Webb, supra,* to create a duty on a business invitor to protect his invitee from the violent actions of a third party. The parties have submitted briefs and reply briefs and the issue is ripe for decision.

## II. Analysis

### A. Standard for Rule 50 Motion

■ Federal Rule of Civil Procedure 50(a)(1) allows the court to enter judgment as a matter of law on any issue when "there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue." Federal Rule of Civil Procedure 50(b) provides in relevant part:

> Whenever a motion for a judgment as a matter of law made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. Such a motion may be renewed.... If no verdict was returned, the court may, in disposing of the renewed motion, direct the entry of judgment as a matter of law or order a new trial.

Fed.R.Civ.P. 50(b). When considering such a motion, the court must consider all the evidence in the light most favorable to the non-moving party, but the non-moving party must produce substantial evidence in support of his claim. *Demaine v. Bank One,* 904 F.2d 219, 220 (4th Cir.1990) (per curiam); *Evington v. Forbes* 742 F.2d 834, 835 (4th Cir.1984). Part of the purpose of such motions is to save the cost of re-litigating a suit in which no material facts are in dispute. *Montgomery Ward & Co. v. Duncan,* 311 U.S. 243, 250, 61 S.Ct. 189, 193, 85 L.Ed. 147 (1940).

■ In this case, very little of the evidence, other than the expert's testimony, is disputed. The facts of the prior incidents— as presented by the testimony, business records of the security guards and the police department—are not disputed by defendant. The facts of the actual incident are not entirely consistent. However, with regard to the issue of the defendant's method of business, none of these inconsistencies are material. Therefore, all that remains of this case is to apply a rule of law to a set of relatively undisputed facts. In these circumstances, a Rule 50 motion is the appropriate means of resolving the issues in the case. In this diversity case, the Court must look to Virginia law to resolve these issues.

### B. Does Defendant's Business Attract or Provide a Climate for Assaultive Crimes?

■ Plaintiff's entire case rests on the negative implications of one paragraph of the

---

6. The jury instruction on the duty of care read as follows:

DUTY OF CARE

Generally, the operator of a business is not liable for the criminal acts of third parties that result in injuries to its customers. However, where the plaintiff can prove that an owner's method of business attracts or provides a climate for assaultive crimes, then the business owner would have a legal duty to its customers to exercise reasonable care in taking measures to protect them.

Therefore, you must first determine from the evidence submitted to you in this case whether Boddie–Noell's method of business attracts or provides a climate for assaultive crimes.

Prior criminal acts of a substantially different kind do not create any such duty. Nor may such a duty arise solely because of prior criminal activity. There must be proof by a preponderance of the evidence that Boddie–Noell's method of business attracted or provided a climate for assaultive crimes.

Thus, the first question you must answer is: Did the plaintiff prove that Boddie–Noell's method of business attracted or provided a climate for assaultive crimes? If the answer is yes, then other issues must be determined. If the answer is no, you must find your verdict for the defendant.

The jury submitted two questions to the Court during the course of their deliberations. These questions indicate that they were primarily concerned with determining whether the defendant's method of business attracted or provided an atmosphere for assaultive crimes.

Virginia Supreme Court's holding in *Wright v. Webb*, 234 Va. 527, 362 S.E.2d 919 (1987). In that case, the Virginia Supreme Court stated:

> We hold that a business invitor, whose method of business does not attract or provide a climate for assaultive crimes, does not have a duty to take measures to protect an invitee against criminal assault unless he knows that criminal assaults against persons are occurring, or are about to occur, on the premises which indicate an imminent probability of harm to an invitee.

*Wright*, 234 Va. at 532, 362 S.E.2d at 922. In order to prevail under *Wright*, plaintiff must establish a duty to protect him from a criminal assault by a third party by showing either 1) that the business invitor's method of business attracts or provides a climate for assaultive crimes, or 2) that the business invitor had knowledge that criminal assaults against invitees are occurring or are about to occur. During the trial, at the close of plaintiff's case-in-chief, this Court granted defendant's motion for judgment on the second prong of the *Wright* test (knowledge of an imminent assault).[7] Thus, in order to prevail on the present motion, plaintiff must first show that Hardee's business attracts or provides a climate for assaultive crimes.

The only guidance the Virginia Supreme Court offers on the issue is negative; they only tell us of conditions which will not create such a duty. The *Wright* court holds that knowledge of previous crimes against *property* does not create a duty to anticipate and guard against crimes against the *person*. *Wright*, 234 Va. at 531, 362 S.E.2d at 921. They also hold that two incidents—an assault on the premises in the previous year and a double murder on the adjacent premises over three years ago—were not sufficient to create such a duty. *Id.* Finally, they are care-

ful to reject specifically the rule in the Restatement (Second) of Torts § 314A (1965), which suggests that a special relationship such as innkeeper/guest may give rise to a duty to protect invitees from the "acts of third persons, whether they be innocent, negligent, intentional, or even criminal." Restatement (Second) of Torts § 314A, comment d.[8]

The distinction between the Virginia rule and the Restatement is very significant. The *Wright* court makes it clear that "acts of assaultive criminal behavior cannot reasonably be foreseen," and that, therefore, no duty will arise out of a history of similar crimes that would cause a reasonable person to anticipate the possibility of similar such crimes in the future. *Wright*, 234 Va. at 531, 362 S.E.2d at 921; *see also Marshall v. Winston*, 239 Va. 315, 389 S.E.2d 902 (1990). Instead, there must be something about the character or method of business which attracts or provides a climate for assaultive crimes for the *Wright* duty to arise.

The Virginia courts have considered the application of *Wright v. Webb* in at least two reported cases. In *Banglesdorf v. Underwood Enterprises, Inc.*, 18 Va.Cir. 491 (1990), the court granted defendant's demurrer where one customer of a fast-food restaurant (a Burger King) assaulted another customer. The court accepted the pled facts as true, including the "history of violence in the general area of the mall," but found that the defendant had no duty to protect the customer where the incident had appeared to have ended peacefully and where no allegation was made that the restaurant was the sort of business that attracted or provided a climate for assaultive crimes. *Id.* at 492–93. Similarly, in *Aldrich v. McDonald's of Virginia, Inc*, 24 Va.Cir. 11 (1990), the court discussed the "very narrow exception" to the rule that

---

7. The only evidence indicating that Hardee's may have been aware that some sort of assault was imminent was that the operator of the drive-through window may have heard some "fussing" at the speaker box a few minutes before the incident happened.

8. Justice Poff's concurrence in *Wright* also discusses § 344 of the Restatement which he would have preferred to adopt. That section would create a duty to warn or take other precautionary

measures when either the character of the business or the invitor's past experience is such that a reasonable person should anticipate criminal assaults on the premises. *Wright*, 234 Va. at 531, 534, 362 S.E.2d at 921, 923; Restatement (Second) of Torts § 344, comment f (1965). The implication of Poff's concurrence is that the majority considered and rejected such a rule, although the majority only explicitly discusses § 314A.

landowners are not liable and implicitly assumed that McDonald's was not the type of business that attracted or provided a climate for assaultive crimes. *Id.* While these cases do not directly rule on the issue, this Court notes that the two cases where Virginia courts have considered the "method of business" question both involved fast-food restaurants. In both of these cases, the Virginia courts suggest, without ruling explicitly on the issue, that fast-food stores do not attract or provide a climate for assaultive crimes by the nature of their business. *See also Tucker v. KFC Nat'l Management Co.*, 689 F.Supp. 560, 563 (D.Md.1988) ("under Maryland law there is no duty for an owner of a small fast food retail store to provide security guard service for its business invitees. Typically, these establishments are open, readily accessible to the public, small, well-lighted and well-trafficked. Every area of service is only a few feet away from publicly policed areas.").

Counsel have not pointed out any Virginia authority on this issue. However, the language used by the *Wright* court came from a Tennessee case, *Cornpropst v. Sloan*, 528 S.W.2d 188, 198 (1975). Thus, Tennessee cases, while obviously not binding on this Court, may provide some insights into the application of this rule in Virginia.

Tennessee courts have been careful to distinguish the issue of notice of imminent probability of harm from the issue of doing business in a manner that attracts or provides a climate for assaultive crimes. In *Cornpropst,* the Tennessee court granted defendant's motion to dismiss for failure to state a claim, holding that a merchants' association of a shopping mall was not liable to a female customer who was assaulted in the parking lot of the mall by a third party.[9] The *Cornpropst* court was careful to note that notice of prior criminal acts would not establish a duty on merchants to protect customers from sudden criminal acts of others. After questioning how such a duty might be deter-

mined, the court concluded that "it is a mistake to equate the duty of shopkeepers with the respect to criminal acts with the duty of shopkeepers with respect to careless acts." *Cornpropst,* 528 S.W.2d at 197. Recently, a Tennessee court revisiting this issue found that a trial court had erred in not granting a motion for judgment notwithstanding the verdict where plaintiff, who was attacked while withdrawing funds from an automatic teller machine (ATM), presented evidence that five similar crimes had happened at that ATM, that the ATM was located in a high-crime area, and that the bank had notice from customers and a crime prevention bureau of the dangerous situation presented by the ATM. Applying the rule in *Cornpropst,* the court found this evidence insufficient to support a jury verdict for plaintiff under the theory that defendant's method of business attracted or provided a climate for assaultive crimes. *Page v. American Nat'l Bank & Trust Co.*, 850 S.W.2d 133, 138–140 (Tenn.Ct. App.1991) *permission to appeal denied* (1993).

Courts in Tennessee and elsewhere also have considered carefully the policy issues in establishing such a rule of liability. The *Cornpropst* court quoted an Oklahoma case, *McMillin v. Barton–Robinson Convoy Co.*, 182 Okla. 553, 78 P.2d 789 (1938), where the plaintiff sought to rely in part on the fact that the defendant's business was located in a high-crime area (80% of the crime committed in the county occurred in the area). That court noted that to find liability based on these facts "would be tantamount to saying that the [area] is a condemned community. We would be saying in legal effect, that those who live there and those who engage in business there are not exercising the prudence and judgment of ordinary people." *Cornpropst,* 528 S.W.2d at 196 (quoting *McMillin*). The *Page* court summarized such a rule as amounting to "negligence per se to do business in a high-crime area." 850 S.W.2d at 139. Similarly, a recent California

---

**9.** The *Cornpropst* court also found that if plaintiff had stated a cause of action, *i.e.*, if the history of crime in the area had created a duty on defendant to police the area, then defendants were still not liable because minds of reasonable [persons] cannot differ but that the sudden act of [the

assailant], which could not have been prevented or deterred by the exercise of reasonable care on the part of the shopping center merchants, was the sole proximate legal cause of harm to [plaintiff].
*Cornpropst,* 528 S.W.2d at 198.

case analyzing the issue of "adequate security" primarily from the standpoint of causation, noted that "Landowners in high crime areas ought not to be forced out of the area or out of business altogether by an imposition of liability to the victims of violent crimes which the police have been unable to prevent." *Nola M. v. Univ. of Southern California*, 16 Cal.App.4th 421, 20 Cal. Rptr.2d 97, 108 (1993) *review denied* (Sept. 23, 1993). Finally, a district court applying Maryland law and refusing to impose a duty to hire a private police force noted,

> No doubt areas of our community vary in the rate of criminal incidents, and retail establishments in areas where there is a higher rate are exposed to greater risk from third-party criminal activity . . . Plaintiff claims that Kentucky Fried Chicken should have insured plaintiff from this risk . . . [T]he law of Maryland does not require the storekeeper to provide this insurance.

> Were the Court to hold otherwise, every newsstand, drug store, fast food establishment, gas station and similar establishment would be required to provide security guard service for its business invitees. The articulation of a duty so broad . . . rests on the legislature and will not be imposed judicially.

*Tucker*, 689 F.Supp. at 563.

The case before us presents very similar issues. The defendant owns and operates a fast-food restaurant in an area of Norfolk near several night clubs. As discussed above, the patrons of these clubs frequent the Hardee's when the clubs shut down around 2:00 a.m. According to the evidence, sometimes these customers cause disturbances at the Hardee's. The evidence also established that plaintiff and his friends, after a night of dancing and drinking, chose the Hardee's after stopping at two other restaurants that were too crowded to accommodate them quickly.

Plaintiff contends that this evidence establishes that "defendant's method of business was to stay open 24 hours and to cater to this particular clientele known for the guns and drugs activity. . . . The defendant's way of doing business was to cater to these people,

to cater to the gangs." Clearly, staying open 24 hours does not give rise to a special duty to protect invitees from third parties. Therefore, plaintiff must rely on the fact that defendant "catered" to a certain crowd. However, the only evidence of "catering" to this crowd is that Hardee's was located in proximity to these clubs and was open. No evidence suggests or even intimates that a special effort was made to attract these customers in particular. Nor did Hardee's encourage or condone any criminal activity on its property. To the contrary, Hardee's took active measures to provide a safer environment. Moreover, the evidence indicates that this is a regular fast food restaurant serving the same menu as hundreds of others.

Finally, if this Hardee's was not open, presumably the "club crowd" would have found some other establishment to serve them food. Would then any establishment which is open to the public and might cater to some people of a like kind be held liable for failing to prevent criminal assaults upon its patrons? Would establishments have the duty to refuse service to the "club crowd" out of some vague sense of possible harm to other patrons of the restaurant? If so, would this refusal constitute discrimination?

Plaintiff urges this Court to find that a "method of business that attracts or provides a climate for assaultive crimes" should be translated as the equivalent of a weather system. If there's an atmosphere of crime near your business, you should be responsible for crimes occurring at your business. Thus, plaintiff argues, because a few incidents of assaultive behavior occurred over a period of eighteen months, this Hardee's should be liable for any criminal assaults that happen to its customers on its premises. While these incidents demonstrate a certain amount of difficulty with the clientele of the restaurant, they also demonstrate the restaurant's ongoing efforts to curb such activity. The evidence indicates that this business was not trying to attract or provide a climate for assaultive crimes. It was trying to serve food in a neighborhood where, on some occasions, there were some aggressive and rude people. Furthermore, the case law is distinctly at odds with such a broad rule, which

would make it nearly impossible to operate a business in an area which might be populated predominantly by minorities or poor people.

The *Wright* court must have intended a business which incorporates a criminal element directly or indirectly into its method of conducting business, in other words, a business which somehow directly benefits from the presence of criminal or assaultive behavior. This Hardee's was not such a business. It was no different than the 280 other Hardee's franchises operated by Boddie–Noel. It did not serve alcohol, legally or illegally. It did not provide a haven for illegal activities: the parking lot was well-lighted; the restaurant is located on a major thoroughfare in a mixed commercial and residential neighborhood; it is designed similarly to all fast-food restaurants. In fact, the restaurant invested significant funds to hire a security agency which provided armed security guards specifically to discourage any criminal elements from disrupting the business. In hindsight, the restaurant may or may not have been able to do more to deter criminal acts on its premises, but—as a matter of law—a business has no duty to prevent such criminal acts unless its method of business attracts or provides a climate for such crimes. This Court holds that no reasonable jury could agree that this Hardee's operated its business in such a manner as to attract or provide a climate for assaultive crimes.

### C. Breach and Causation

Because this Court is satisfied that no duty existed, it is not necessary to reach issues of breach and causation. However, the Court does note that other jurisdictions have been rightfully troubled by these issues. The California courts have recently stated the issue well:

> where do we draw the line? How many guards are enough? ... How much light is sufficient? ... To characterize a landowner's failure to deter the wanton mindless acts of violence of a third person as the 'cause' of the victim's injuries is (on

these facts) to make the landowner the insurer of the absolute safety of everyone who enters the premises.

*Nola M.*, 20 Cal.Rptr.2d at 108.

In the case before this Court, the entire premises of the restaurant were well-lighted. The restaurant hired a private security service to provide security.[10] When the single guard indicated that the situation was difficult during the busy early morning hours, the security agency recommended that a second guard be added for the early morning hours on weekends. These guards successfully controlled incidents both inside and outside the restaurant. Key Security's site instructions directed the guards to patrol outside every half hour. The uncontradicted evidence is that, on the evening in question, the guards did patrol outside on that schedule, perhaps within a few minutes of this incident.

Plaintiff contends that these security measures were inadequate, suggesting that adequate security demanded some sort of presence outside the Hardee's at all times. Plaintiff offered expert testimony to this effect.[11] However, as the *Nola M.* court, in discussing another California case, noted:

> Starting from the premise that it would be grossly unfair to permit a lay jury, after the fact, to determine in any case that security measures were "inadequate," particularly in light of the fact that the decision would always be rendered in a case where the security had, in fact proved inadequate, the court observed: "It appears that a growth industry is developing consisting of experts who will advise and testify as to what, in their opinion, constitutes 'adequate security.'"

*Nola M.*, 20 Cal.Rptr.2d at 102 (quoting *Noble v. Los Angeles Dodgers, Inc.*, 168 Cal. App.3d 912, 214 Cal.Rptr. 395 (1985)). This Court need not reach the issue of breach and, therefore, need not comment on the adequacy of the security provided or the plaintiff's expert's opinion thereof. However, the

---

**10.** Because it is not necessary to the resolution of this case, the Court will not reach the issue of Key Security's status as an independent contractor.

**11.** Plaintiff offered no evidence of security procedures or guard deployment at the other two restaurants plaintiff visited that night or, indeed, at any other establishment at all.

Court would hesitate to enter into an open-ended inquiry into the "adequacy" of security measures without some rules to follow. Otherwise, whenever an incident occurs, security will be found to be inadequate.

### III.  Conclusion

Mr. Godfrey's injuries are, of course, undeserved; he is yet another victim of the alarming increase in random gun violence that presently plagues our country. The fact that police have been unable to identify or apprehend his assailant is frustrating. But to respond to this situation by holding Hardee's liable would only create a rule of liability that would threaten the existence of legitimate businesses serving the population in certain areas.

Under Virginia law, the evidence in this case, even when considered in the light most favorable to plaintiff, is not sufficient for any reasonable jury to conclude that the defendant conducted his business in such a way as to attract or provide a climate for assaultive crimes. Accordingly, defendant's motion for judgment as a matter of law is GRANTED.

The Clerk of the Court is DIRECTED to enter judgment for the defendant. The Clerk is further DIRECTED to forward copies of this order to counsel for the parties.

IT IS SO ORDERED.